Ramey Investment Corporation (Formerly Ramey Air Base Homes, Inc.) v. Commissioner.
Ramey Inv. Corp. v. Commissioner
Docket No. 1414-65.
United States Tax Court
T.C. Memo 1967-4; 1967 Tax Ct. Memo LEXIS 255; 26 T.C.M. (CCH) 17; T.C.M. (RIA) 67004; January 11, 1967
George E. Grimball, Jr., 7 Broad St., Charleston, S.C., and J. C. Long, 90 Broad St., Charleston, S.C., for the petitioner. Winfield A. Gartner and J. Larry Broyles, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined a deficiency of $485,963.13 in petitioner's income tax for its taxable year ended October 31, 1958. The issues presented for our decision are: 1. Did petitioner's gain on the sale, under threat of condemnation, of its rental housing project in Puerto Rico in the taxable year ended October 31, 1958, constitute gross income within the meaning of section 931 of the Internal Revenue Code of 1954? 2. Did the petitioner reinvest the proceeds from such sale in "like kind" property within *259 the meaning of section 1033(g) of the Internal Revenue Code of 1954? If we find that petitioner properly reinvested in like kind property, then we must determine the following questions: 3. What was the fair market value of the property in which petitioner reinvested? 4. What was the amount realized (within the meaning of section 1033(a)(3)(A) by petitioner upon the sale of its Puerto Rican property and how much, if any, is taxable to the petitioner? If we find that petitioner did not invest in like kind property, we must answer the following question: 5. What was the amount of taxable gain realized by petitioner on the sale of its Puerto Rican property and what was the amount of deductible expenses with respect to that sale? Findings of Fact Some of the facts have been stipulated and the stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Ramey Investment Corporation, formerly Ramey Air Base Homes, Inc. (hereinafter referred to as petitioner) was incorporated under the laws of the State of South Carolina on November 8, 1951. Petitioner's principal office was located in Charleston, South *260 Carolina. Leonard D. Long owned all of petitioner's capital stock and was its president for all but the first 2 years of its existence. Petitioner filed accrual basis income tax returns in Puerto Rico on a fiscal year ending October 31. Petitioner also filed accrual basis Federal income tax returns on a fiscal year ending October 31. The Federal returns, including the returns for its fiscal year ended October 31, 1958, were filed with the district director of internal revenue at Columbia, South Carolina. Petitioner was organized to own and operate a so-called "Wherry Housing Project" in Puerto Rico. Petitioner then leased a parcel of land in Puerto Rico from the United States Government for a period of 75 years. A sister corporation, Long Construction Company (all of whose capital stock was owned by Leonard D. Long) constructed on the leased land, for petitioner, a Wherry Housing Project consisting of 575 reinforced concrete rental apartments. From the date of its incorporation until the latter part of 1957 the petitioner's primary source of income was from the leasing of this housing. In late 1957, petitioner and the United States Air Force (under the authority of the "Capehart *261 Act") began negotiations for the purchase of petitioner's housing project. As a result of these negotiations, the project was purchased by the United States under a contract negotiated and consummated in the State of Virginia. Under the contract the United States paid $1,560,000 in cash and assumed all outstanding mortgages on the property. The cash plus mortgages assumed totaled $5,952,508.06. Respondent concedes that the sale of the Puerto Rican property was made under threat or imminence of condemnation. The Purchase Agreement reads, in part, as follows: THIS AGREEMENT made this December 18, 1957, by and between the United States of America, acting by and through the SECRETARY OF THE AIR FORCE (hereinafter called "Department") and RAMEY AIR BASE HOMES, INC., a corporation existing under the laws of the State of South Carolina, with its principal office in Charleston, Charleston County, South Carolina (hereinafter called "Lessee"), WITNESSETH: WHEREAS, Section 512 of Public Law 1020, 84th Congress (70 Stat. 1111) amending Section 404 of the Housing Amendments of 1955 (69 Stat. 652), as amended, and Section 312 of Public Law 814, 84th Congress authorize the Department to acquire *262 Wherry Act Housing and to assume outstanding mortgages upon such housing; and WHEREAS, the Assistant Secretary of Defense (Properties and Installations) has deemed it necessary and has approved the acquisition of the Lessee's equity in the Wherry housing project located at Ramey Air Force Base, Ward of Malezes Atlas, Municipality of Aguadilla, Commonwealth of Puerto Rico; and WHEREAS, a purchase price for the acquisition of the Lessee's equity in this housing project has been negotiated pursuant to the provisions of Section 404 of the Housing Amendments of 1955, as amended, and the Department of Defense Instructions 4165.31, dated November 26, 1956, as amended; THEREFORE, the parties hereto agree as follows: 1. In consideration of ONE MILLION FIVE HUNDRED SIXTY THOUSAND DOLLARS ($1,560,000.00), the Lessee agrees to assign, surrender, bargain, sell, convey, and release to the Department all of its right, title and interest in the following described properties and contracts: (a) A leasehold estate as set forth in Contract No. AF 66 (600) S-3 executed by the Department to the Lessee, on December 13, 1951, and recorded in the Registry of Property of Aguadilla, Ward of Malezes *263 Atlas, Commonwealth of Puerto Rico, at Folio 226 of Book 83 of Aguadilla; (b) An Administration building, exclusive of personal property therein, located on land covered by the leasehold estate referred to in (a) above, said building being approximately two hundred (200) feet East of the center lines of the intersection of Cliff and Northeast Roads, approximately thirty-five (35) feet South of the center line of Cliff Road; (c) All of the real and personal properties, including any easements and rights-of-way, included under the provisions of a mortgage executed by the Lessee on February 4, 1952, to Manufacturers Trust Company, recorded in Book 104 of Aguadilla, at Folio 120 in the Registry of Property of Aguadilla, Ward of Malezes Atlas, Commonwealth of Puerto Rico, said mortgage securing payment of a note, dated February 4, 1952, in the original principal amount of FOUR MILLION SEVEN HUNDRED TWENTY-FIVE THOUSAND DOLLARS ($4,725,000.00), executed by Lessee payable to Manufacturers Trust Company or order, which mortgage and note was assigned to Dollar Savings Bank on September 30, 1953. (d) All the personal property included under a Chattel Mortgage executed by the Lessee to *264 Manufacturers Trust Company on September 28, 1953, and filed for record in the Office of Chattel Mortgage Registry of Aguadilla, Ward of Malezes Atlas, Commonwealth of Puerto Rico, in Book 20, Folio 54, said chattel mortgage also securing the payment of said note referred to in paragraph 1(c) above, which chattel mortgage was assigned to Dollar Savings Bank, said assignment being recorded on October 10, 1953, in Book 20, Folio 55 of the aforesaid records; (e) A purchase contract designated as Contract No. AF 66 (600) S-4 between the United States of America, represented by the Contracting Officer of Ramey Air Force Base, and the Lessee, dated December 13, 1951. (Hereinafter sometimes where the word "Properties" is used in this Agreement, it refers to those property interests identified in subparagraphs (a), (b), (c), (d) and (e), above.) 2. The Department agrees to accept the surrender of the leasehold, the sale of the properties and the release of the interests and rights described above, and hereby releases the Lessee of all its obligations which might arise with respect to the aforesaid property interests and contracts on or after the date that title to the aforesaid properties *265 passes to the Department as provided in paragraph 4, below. 3. The consideration for this contract shall be due and payable by the Department in a lump sum for cash on the day the title to the properties under this contract shall pass, but not before the Department has had reasonable time to secure title approval from the Attorney General of the United States, but this initial payment shall be made on or before March 1, 1958. Included within the consideration mentioned above is an amount of SEVEN THOUSAND FIFTY-THREE DOLLARS SEVENTY-THREE CENTS ($7,053.73) which the Lessee will pay on behalf of the Department as the principal payment due on the aforesaid mortgage note on the date that title passes to the properties. Pursuant to the provisions of the Assignment of Claims Act of 1940, as amended, claims for moneys due or to become due the Lessee from the United States of America under this contract may be assigned to a bank, trust company, or other financing institutions, including any Federal lending agency, and may thereafter be further assigned and reassigned to any such institution. Any such assignment or reassignment shall cover all amounts payable under this contract and *266 not already paid, and shall not be made to more than one party, except that any such assignment or reassignment may be made to one party as agent or trustee for two or more parties participating in such financing. Notwithstanding any other provision of this contract, payments to an assignee of any moneys due or to become due under this contract shall not, to the extent provided in said Act as amended, be subject to reduction or set-off. Upon request of the Lessee or its assignees, the Department will certify the amount due and owing by the Department to the Lessee under this Purchase Agreement at the date of any such assignments. 4. Title shall pass to the properties on January 1, 1958. 5. It is understood by the Department that the properties described in paragraphs 1(a), (b), (c) and (d) above are being surrendered and conveyed by the Lessee subject to a certain mortgage and note identified in paragraph 1(c) above; and the properties described in paragraph 1(d) above are being conveyed subject to a certain chattel mortgage identified in said paragraph 1(d); and the Department hereby agrees to assume the obligations of said note, mortgage and chattel mortgage and agrees that *267 from and after the date title passes it will satisfy, make provision for avoiding default under or make all payments called for in accordance with the terms and provisions of said note, mortgage and chattel mortgage. Due to the outstanding mortgages petitioner's equity in the Puerto Rican property was $1,560,000. The United States Government mailed a check for $1,560,000 to the petitioner at its principal office in Charleston, South Carolina. The check was received at that office by T. E. Steadman, secretary of the corporation, on February 20, 1958. It was forwarded on the same day to petitioner's office in Puerto Rico where it was deposited in petitioner's only bank account on February 25, 1958. The purchase agreement between the United States and petitioner provided that title to the Puerto Rican property would pass to the United States on January 1, 1958. Petitioner vacated the housing project on January 1, 1958, and the United States took possession and title on that date. On its Puerto Rican and Federal income tax returns for its taxable year ended October 31, 1958, petitioner described the above transaction as an involuntary conversion, and indicated that an election was *268 thereby made to have the gain not recognized by reason of the provisions of section 1033 of the Internal Revenue Code of 1954 and the corresponding provisions of the tax laws of Puerto Rico. The transaction was reported on the petitioner's Federal income tax return for the taxable year ended October 31, 1958, as follows: EXPLANATION OF INVOLUNTARY CONVERSION OF PROPERTY During the taxable year, taxpayer realized a gain of $1,943,852.53 (as computed hereinbelow) from the sale under threat of imminence of condemnation of its interest in real estate and other depreciable properties (a Wherry Housing Project) used in its trade or business. Taxpayer expects to invest the proceeds from such sale in other property similar or related in service or use during the period permitted by section 1033 of the Internal Revenue Code of 1954. Accordingly, an election is hereby made to have the gain not recognized under the provisions of section 1033 of such Act. The gain of $1,943,852.53 is computed as follows: Proceeds from sale under threat of condemnation (1-7-58)
$5,952,508.06
Less expense of sale
29,598.49
Net proceeds
$5,922,909.57
Cost of properties (10-1-53)
$4,861,161.66
Less: allowable depreciation
882,104.62
3,979,057.04
Nontaxable gain
$1,943,852.53
*269 On September 2, 1959, petitioner requested of the United States Government an extension of time within which to reinvest the proceeds from the sale of its Puerto Rican property. On September 15, 1959, an extension was granted to October 31, 1960. Petitioner's request for a similar extension of time made to the Commonwealth of Puerto Rico was denied. Petitioner thereupon received a notice of deficiency from the Commonwealth of Puerto Rico determining a tax due, with respect to the Puerto Rican property, of $397,051.19, plus interest. This tax has not yet been paid by petitioner. Puerto Rico had previously determined deficiencies against petitioner by adjusting the useful lives claimed by petitioner with respect to both its real and personal property, and had also allowed certain selling expenses not originally claimed with respect to the sale of the Puerto Rican rental project. On August 1, 1960, the petitioner purchased certain properties (hereinafter sometimes referred to as the reinvestment property) from Long Corporation for a stated consideration of $5,990,129.58. The property purchased by petitioner consisted in general of the following: 7.67 acres with office and warehouse
*270 2.42 acres of commercial land 154 houses 185 completely improved lots 391 partially improved lots 75 acres bordering expressway 453 acres of rural land All of the properties purchased were part of a tract of land known as Longview, Dekalb County (an outlying acrea of Atlanta, Georgia). Long Corporation was incorporated under the laws of South Carolina. The books and records of Long Corporation reflect that it had a basis in the above property of $5,194,203.77 * and that its selling expenses were $24,012.69. L. D. Long owned, except for qualifying shares, all of the capital stock of the petitioner, Long Construction Company, and Long Corporation. Leonard Long is the son of L. D. Long, and these individuals and their corporations will sometimes hereinafter be referred to as the Long interests. Leonard Long was in charge of all Atlanta operations of the Long interests. The reinvestment property (hereinafter sometimes referred to as Longview) sold to the petitioner on August 1, 1960, was acquired by Long Corporation as raw land in late 1949 at a cost of approximately $420,192.86. The reinvestment property was put together by Long Corporation in late 1949 which began development *271 of the tract in 1957. In the same year certain parcels of the tract were transferred to the five related development corporations owned by Leonard Long and his brothers: Baker Hills, Inc.; Monte Vista, Inc.; Mount Lawn Gardens; Park Vista Homes, Inc.; and Skyline View, Inc., which proceeded to build houses on the property. The tract was fully platted. It was divided into half, front half and back half, because of it being bisected by the then proposed Atlanta Circumferential Highway. The back half during all times relevant herein remained undeveloped. The front half, in turn, was divided into three sections: Section 1, Section 2, and Section 3. The initial development concerned primarily Sections 1 and 2. All those sections were fully improved, i.e., streets cut, graded and paved, water and sewage, etc., blocks of lots were parceled out, in 1957, to the five related development corporations. On August 1, 1960, Long Corporation repurchased the developed property form the five related development corporations for $3,744,779.58. This developed property, along with the remainder of the tract, formed the land transferred to petitioner on that same date. The five development corporations *272 built a total of 197 houses prior to acquisition of the property by petitioner from Long Corporation. They sold 43 houses between May 1959 and December 1959, as follows: Number of
Month
Houses Sold
May
6
June
2
July
3
August
2
September
5
October
4
November
12
December
7
Not known
2
Total
43 The Long interests had previous experience in the building business which consisted primarily of building war project rental houses, apartment buildings, and low-cost housing in Puerto Rico. The Longview property was their first venture into quality houses, the prices ranging from $17,000 to $22,000. In December 1959, the development corporations owning portions of the reinvestment properties ceased their conventional selling operations and began disposing of the houses at Longview under long-term leases which contained options to purchase. The use of such leases had proved, for the Long interests, to be an excellent vehicle for disposing of the houses they had built in Puerto Rico and most of those houses were eventually sold by using this method. These leases had an option to purchase the houses at a ratably declining price which was set forth in the *273 contract. The contracts at Longview were for terms of 20 or 30 years, most running for 30 years. Of the 154 houses acquired by petitioner on August 1, 1960, 102 were under leases with options to purchase. The remaining 52 houses were vacant. Of the 102 houses under "lease-options" two of them were occupied under lease-options prior to June 30, 1959; 49 between July 1, 1959, and December 31, 1959; 41 between January 1, 1960, and June 30, 1960; and 10 after June 30, 1960. There were no houses leased or sold by the petitioner from the end of August 1960 until January 1961. The lease-option agreements under which these houses were disposed of provided that the monthly rental payments would be increased or decreased in the event of an increase or decrease in taxes or insurance. After the petitioner acquired the properties on August 1, 1960, it entered into seven new lease options of houses. After petitioner acquired the properties involved on August 1, 1960, no effort was made to sell houses and none of the houses acquired subject to lease-options were sold to the individuals who held the leases. Petitioner did not maintain a sales office for the sale of property, advertise the property *274 for sale, clear any of the land it bought on August 1, 1960, build any houses on the property, make any improvements on the property other than minor repairs to the houses, or construct any streets or sewers. The $5,990,129.58 purchase price was to be paid by the petitioner in the following manner: Cancellation of receivable due from Long Corporation
$ 600,000.00
Assumption of existing mortgages
2,282,399.83
Secured note payable to Long Corporation
1,499,729.75
Unsecured note payable to Long Corporation
1,608,000.00
$5,990,129.58 The $1,499,729.75 secured note bore interest at the rate of 4 percent and was due $500,000 on August 1, 1961; $500,000 on August 1, 1962; and the balance $499,729.75 on July 15, 1963. The $1,608,000 unsecured note bore interest at the rate of 4 percent and was due $80,400 on August 1, 1964, and on each successive August 1, up to August 1, 1983. The monthly mortgage payments on the 154 homes totaled $19,827. This $19,827 payment was made in full from August 1960 until late December 1960, at which time petitioner began selling the houses piecemeal to Longview Realty Co., Inc. (hereinafter referred to as Longview Realty). Longview *275 Realty was a real estate sales corporation, 80 percent owned by Leonard Long, which had been incorporated for the purpose of selling the houses built by the original five development corporations. Without any sale of the property, the yearly payments due by petitioner as a result of the above described transaction would amount to approximately $750,000 in the first 3 years and approximately $320,000 for the next 20 years thereafter. These figures represent the $19,827 monthly mortgage payments plus the amounts due on the two notes to Long Corporation. The lease-option arrangement used by petitioner proved to be unsuccessful in keeping its houses fully occupied. Petitioner thereupon began selling houses in blocks to Longview Realty because petitioner could not adequately meet its financial obligations. The properties purchased by petitioner on August 1, 1960, were disposed of as follows: Date
Purchaser
Description
Selling Price
12-23-60
Longview Realty
5 houses
$ 78,000.00
4- 1-61
Longview Realty
12 houses
168,000.00
5- 1-61
Longview Realty
30 houses
420,000.00
6- 1-61
Longview Realty
5 houses
70,000.00
7- 1-61
Longview Realty
13 houses
182,000.00
8- 1-61
Longview Realty
8 houses
112,000.00
9- 1-61
Longview Realty
9 houses
126,000.00
10- 1-61
Longview Realty
11 houses
154,000.00
11- 1-61
Longview Realty
12 houses
168,000.00
2- 1-62
Longview Realty
5 houses
70,000.00
4-12-62
Longview Realty
2 houses
28,000.00
5-22-62
Longview Realty
3 houses
42,000.00
7- 2-62
Longview Realty
3 houses
42,000.00
3- 1-63
Longview Realty
4 houses
56,000.00
4-16-63
Long Realty Corp.
32 houses
448,000.00
4-16-63
Long Realty Corp.
Warehouse
275,000.00
4-16-63
Long Realty Corp.
2.42 acre tract
12,000.00
2- 8-62 *
Edwards Engineering Co.
All remainder of
tract with exception
of the above
1,500,000.00
Total
$3,951,000.00
*276 The above sales of houses to Longview Realty were initially made on the basis of which house Leonard Long thought would sell best. The only sale not made through associated corporations of the Long interests was made to Edwards Engineering Company on February 8, 1962, for a price of $1,500,000 including $500,000 in cash. This sale was stimulated by the continuing financial troubles of petitioner, the lack of cash prevalent throughout the Long interests and the serious illness of petitioner's president. The sale to Edwards Engineering Company, although not for the highest price offered for the property, was accepted by the Long interests because it brought the largest cash downpayment offered and the excellent financial stability of the purchaser allowed the immediate hypothecation of the $1,000,000 mortgage for a line of credit of $750,000. On its income tax returns for the years ended October 31, 1960, and October 31, 1961, petitioner reported rental income of $48,460.18 and $137,931.82, respectively. The petitioner also reported income of $1,310,000 from the sale of real estate in the latter year. All of the *277 above rental and sales income came from the Longview property. As of October 31, 1963, petitioner had disposed of all the property purchased from Long Corporation. Petitioner's balance sheet at the end of that year disclosed the following assets and liabilities: Assets
Amount
None
0
Total assets
0
Liabilities
Accounts payable
$ 13,355.88
Notes payable
511,900.36
Net Worth
Capital stock
300.00
Surplus (deficit)
(525,556.24)
Total liabilities and net
worth
0 The $525,256.24 in liabilities shown due on the petitioner's balance sheet for its fiscal year ended October 31, 1963, was due to Long Corporation and was written off as a bad debt by Long Corporation in its fiscal year ended March 31, 1964. Long Corporation actually claimed a total writeoff in the amount of $418,714, representing an open account due from petitioner for interest in the amount of $13,355.88 and the basis portion of the balance due on the unsecured note in the amount of $405,358.92 (actual balance due of $511,900.36 less unreported deferred profit of $106,541.44). In his notice of deficiency respondent determined that the gain on the sale as computed in the petitioner's Federal income *278 tax return for the taxable year ended October 31, 1958, was taxable to petitioner to the full extent thereof, because petitioner did not reinvest in property which qualified under section 1033, Internal Revenue Code of 1954. In the alternative, it was determined that gain was realized, in any event, to the extent that the sale proceeds exceeded the fair market value of the reinvested property which respondent determined to be not in excess of $3,979,057.04. Ultimate Findings 1. On August 1, 1960, the fair market value of the 7.67 acres, including the office and the warehouse, was $300,000. 2. On August 1, 1960, the fair market value of the 2.42 acres of commercial land was $12,000. 3. On August 1, 1960, the fair market value of the 154 houses purchased by Ramey from the Long Corporation was $2,580,000. 4. On August 1, 1960, the fair market value of the 185 completely improved lots (including the school sites and the church sites) was $468,500. 5. On August 1, 1960, the fair market value of the 391 partially improved lots was $869,500. 6. On August 1, 1960, the fair market value of the 75 acres of raw land immediately surrounding the expressway *279 was $375,000. 7. On August 1, 1960, the fair market value of the remaining 453 acres was $1,041,900. 8. On August 1, 1960, the total fair market value of the Longview property was $5,647,000. 9. The Puerto Rican property was held by petitioner for rent and investment. The Longview property was held by petitioner for rent and investment. The Longview property was not held primarily for sale. The two properties were of "like kind." Opinion In January 1958 the petitioner, a South Carolina corporation doing business solely in Puerto Rico, sold its Puerto Rican rental housing project under threat or imminence of condemnation to the United States Government for $5,952,508.06. The price was paid by the assumption of $4,392,508.06 in outstanding mortgages against the property and the issuance of a $1,560,000 check on the United States Treasury. Pursuant to the contract of sale, title and possession passed to the United States on January 1, 1958. The $1,560,000 check was sent to petitioner's principal office in Charleston, South Carolina, on February 20, 1958. On the same day, T. E. Steadman, secretary of the corporation, forwarded the check to petitioner's office in Puerto Rico and *280 the check was deposited in its only bank account there. With its income tax returns for the fiscal year ended October 31, 1958, petitioner filed elections with both the United States Government and the Puerto Rican Government not to recognize the gain on the above transaction under section 1033, Internal Revenue Code of 1954, [1] and the comparable section of the Puerto Rican tax laws. On August 1, 1960, petitioner timely reinvested the proceeds from the sale of its Puerto Rican property in a partially completed real estate subdivision purchased from a related corporation. In December 1964, petitioner received a notice of deficiency from respondent which determined that it did not reinvest in properties similar or related in service or use to the property sold under threat of condemnation and required that petitioner recognize, for its fiscal year ended October 31, 1958, the entire $1,943,852.53 gain from the sale as capital gain. In the alternative, respondent determined in the notice of deficiency that the fair market value *281 of the reinvestment property purchased by petitioner was not in excess of $3,979,057.04 and that there was no bona fide purchase to the extent that the price paid by petitioner exceeded that amount. In its petition the petitioner raised several new issues. First, it alleged that the gain from the sale of the Puerto Rican property was $1,588,244.77 rather than the $1,943,852.53 gain reported on its Federal income tax return. Petitioner attributed this difference substantially to certain adjustments to the useful life of its Puerto Rican property and to the concomitant adjustments to its depreciation deductions made by the Puerto Rican Government subsequent to the sale of the property. Petitioner claims that the United States Government should be bound by the adjustments made by the Puerto Rican authorities. Second, petitioner claims that to satisfy the requirements of section 1033 it was required to reinvest only the net cash proceeds of the sale, $1,560,000, in excess of the assumed mortgages. Third, petitioner claims that in any event the transaction was not subject to United States income taxes because it qualified under section 931 (pertaining to the exclusion from gross income *282 of income received from sources within possessions of the United States). Respondent now concedes that petitioner had only to reinvest in "like kind" property in order to satisfy the provisions of section 1033. Respondent has also changed his position as to the value of the reinvestment property and now claims that the value of such property was not in excess of $4,502,200. Our ultimate findings of fact are dispositive of the latter issue, i.e., the total value of the reinvestment property was $5,647,000. Alternatively, respondent contends that, at least to the extent of $305,508.06 (the difference between the proceeds from the involuntary conversion and the fair market value of the reinvestment property), the petitioner is taxable. Since petitioner will in no event be subject to United States income tax if all of its 1958 income was properly excludable from gross income under section 931, we will first consider the applicability of that section to the sale of its Puerto Rican rental property. At all times prior to the sale of the property the petitioner derived its income almost exclusively from the trade or business of renting housing, primarily to Ramey Air Force Base military *283 personnel and civilian employees. This rental income was exempt from United States tax by reason of the provisions of section 931, the pertinent portions of which are as follows: SEC. 931. INCOME FROM SOURCES WITHIN POSSESSIONS OF THE UNITED STATES. (a) General Rule. - In the case of citizens of the United States or domestic corporations, gross income means only gross income from sources within the United States if the conditions of both paragraph (1) and paragraph (2) are satisfied: (1) Three-Year Period. - If 80 percent or more of the gross income of such citizen or domestic corporation (computed without the benefit of this section) for the 3-year period immediately preceding the close of the taxable year (or for such part of such period immediately preceding the close of such taxable year as may be applicable) was derived from sources within a possession of the United States: and (2) Trade or Business. - If - (A) in the case of such corporation, 50 percent or more of its gross income (computed without the benefit of this section) for such period or such part thereof was derived *284 from the active conduct of a trade or business within a possession of the United States; or (B) in the case of such citizen, 50 percent or more of his gross income (computed without the benefit of this section) for such period or such part thereof was derived from the active conduct of a trade or business within a possession of the United States either on his own account or as an employee or agent of another. (b) Amounts Received in United States. - Notwithstanding subsection (a), there shall be included in gross income all amounts received by such citizens or corporations within the United States, whether derived from sources within or without the United States. (c) Definition. - For purposes of this section, the term "possession of the United States" does not include the Virgin Islands of the United States, and such term when used with respect to citizens of the United States does not include Puerto Rico. Does Puerto Rico qualify as a possession of the United States? Section 931(c) provides that with respect to citizens the term "possession of the United States" does not include Puerto *285 Rico. However, Puerto Rico is not excluded with respect to domestic corporations. Section 7701(c) provides that, where not otherwise provided, references in the Internal Revenue Code to possessions of the United States shall be treated as also referring to the Commonwealth of Puerto Rico. Therefore, for purposes of section 931 as applied to domestic corporations, Puerto Rico is a possession of the United States. Section 931, as it relates to this case, contains three other prerequisites to the petitioner's excluding from its gross income the gain from the sale of its Puerto Rican property. These prerequisites are: (1) That 80 percent of its income be from outside of the United States (931(a)(1)); (2) that 50 percent or more of its gross income over the 3-year period ended October 31, 1958, be derived from the active conduct of a trade or business within Puerto Rico (931(a)(2)(A)); and (3) that the amount received from the sale must not be received in the United States (931(b)). Respondent concedes *286 that the first prerequisite has been met by petitioner. The second prerequisite becomes involved only if the gain from the sale of the Puerto Rican property was more than 50 percent of petitioner's total gross income for the 3-year period ended October 31, 1958. For the years ended October 31, 1956, and October 31, 1957, petitioner's gross income was $501,424.51 and $494,031.34, respectively, all or substantially all of which was derived from the operation of its rental business in Puerto Rico. For the year ended October 31, 1958, petitioner's gross income was $99,834.60, without considering the gain from the sale of the Puerto Rican property, all or substantially all of which was derived from its rental business in Puerto Rico. The gross income from the sale under any method of computation far exceeds 50 percent of the petitioner's total gross income for the 3-year period ended October 31, 1958. The parties agree that the gain realized from the sale of the Puerto Rican property is deemed to be income from a Puerto Rican source by virtue of the provisions of section 862(a)(5). The respondent poses two questions for us to resolve with regard to section 931: (1) Whether the gain from *287 the sale of the housing project constituted income from the active conduct of a trade or business; and (2) whether the proceeds from the sale were received within the United States. However, before reaching these two questions, there is a threshold question we must answer: Was the gain realized by petitioner includable in its gross income for its taxable year ended October 31, 1958, so as to be part of the 50 percent computation made under section 931(a)(2)(A)? In other words, section 931(a)(2)(A) requires that "50 percent or more of its [the domestic corporation'] gross income (computed without the benefit of this section [section 931])" [Emphasis supplied.] for the 3-year period immediately preceding the close of the taxable year must be derived from the active conduct of a trade or business within a possession of the United States. Thus we must compute petitioner's gross income for its taxable year ended October 31, 1958 (without the benefit of the provisions of section 931) as we would that of any other domestic corporation. When petitioner filed its Federal income tax return for its taxable year ended October 31, 1958, it also filed a proper election under the provisions *288 of section 1033 not to recognize the gain from the sale of the Puerto Rican property. The Commissioner's regulations provide that if a taxpayer makes an election the gain realized on the transaction should be excluded from gross income for the year of the sale or other conversion. See section 1.1033(a)-2(c)(2), Income Tax Regs. If the taxpayer reinvests the entire proceeds from the sale in the proper type of property within the time period set forth in section 1033(a)(3)(B), then no gain is recognized by the taxpayer and certain adjustments are made to the basis of the reinvestment property. See section 1033(c). If the taxpayer does not reinvest in the proper type of property within the above time limits or does not reinvest the entire proceeds, then the taxpayer's tax liability for the year for which the election was made is recomputed. See section 1.1033(a)-2(c)(2), Income Tax Regs. Hence, at the time of the filing of the Federal income tax return for petitioner's tax year ended October 31, 1958, the gain from the sale of its Puerto *289 Rican property was properly excludable from gross income. We think that the provisions of section 931 (b) do not change this result. Section 931(b) merely provides that amounts, otherwise excludable from gross income under the provisions of section 931(a), are includable in gross income if received within the United States. We understand this to mean that section 931(b) is applicable only to amounts excludable from gross income under the provisions of section 931(a). We have already found that we cannot determine what petitioner's gross income was for purposes of section 931(a)(2)(A) until we have first decided to what extent, if any, petitioner properly reinvested the proceeds from the sale of its Puerto Rican property. Consequently, not until we have made this determination and then decided whether or not 50 percent of such gross income came from the active conduct of a trade or business can we finally determine what amount, if any, of petitioner's gross income (computed without the benefit of section 931) is excludable from gross income under section 931(a) and thus subject to the exception contained in section 931(b). Therefore, even if all of the proceeds from the sale of the *290 Puerto Rican property were received within the United States (within the meaning of section 931(b)), none would be includable in the computation of gross income under section 931(a)(2)(A) (or section 931(a)(1) for that matter) as long as a proper election was made under section 1033. Thus, if petitioner did properly reinvest the entire proceeds from the sale of the Puerto Rican property, none of the gain from that sale should be includable in gross income under section 931 under any circumstances and petitioner should not be liable for United States income tax, at least within the ambit of this case. Did petitioner properly reinvest under the provisions of section 1033? If not, then we must apply the provisions of section 931 to determine whether or not the proceeds from the sale of Puerto Rican property were derived from the active conduct of a trade or business and, if they were, the amount, if any, which was received within the United States. However, even if petitioner did properly reinvest under section 1033, there will still be $305,508.06 (the difference between the total proceeds received by petitioner from the sale of its Puerto Rican property and our determination of the *291 fair market value of the reinvestment property) of gain recognizable under section 1033 to which we will have to apply the provisions of section 931. This amount ($305,508.06) is substantially less than the rental income ($1,095,290.45) earned by petitioner for the 3-year period immediately preceding the close of its 1958 fiscal year and thus less than 50 percent of the gross income for that period. Consequently, if petitioner properly reinvested, we will not have to determine whether the $305,508.06 was derived from the active conduct of a trade or business but merely how much, if any, of it was received within the United States. Section 1033 provides generally for the nonrecognition of gain realized from the involuntary conversion (or sale under threat or imminence thereof) of property. [2]Section 1033(g) specifically deals with the condemnation of real property held for productive use in a trade or business or for investment and reads as follows: (g) Condemnation of Real Property Held for Productive Use in Trade or Business or for Investment. - (1) Special Rule. - For purposes of subsection *292 (a), if real property (not including stock in trade or other property held primarily for sale) held for productive use in trade or busines or for investment is (as the result of its seizure, requisition, or condemnation, or threat or imminence thereof) compulsorily or involuntarily converted, property of a like kind to be held either for productive use in trade or business or for investment shall be treated as property similar or related in service or use to the property so converted. (2) Limitations. - (A) Purchase of Stock. - Paragraph (1) shall not apply to the purchase of stock in the acquisition of control of a corporation described in subsection (a)(3)(A). (B) Conversions Before January 1, 1958. - Paragraph (1) shall apply with respect to the compulsory or involuntary conversion of any real property only if the disposition of the converted property (within the meaning of subsectiona)(2)) occurs after December 31, 1957. *293 Since respondent concedes that petitioner's property in Puerto Rico was held for investment or for productive use in the petitioner's trade or business and that its sale took place subsequent to December 31, 1957, it is only necessary that the petitioner has reinvested in property of "like kind" to qualify under section 1033(g). Section 1.1033(g)-1(a), Income Tax Regs., refers us, for the principles to be considered in determining whether the replacement property is property of "like kind," to paragraph (b) of section 1.1031(a)-1 which reads as follows: (b) As used in section 1031(a), the words "like kind" have reference to the nature or character of the property and not to its grade or quality. One kind or class of property may not, under that section, be exchanged for property of a different kind or class. The fact that any real estate involved is improved or unimproved is not material, for that fact relates only to the grade or quality of the property and not to its kind or class. Unproductive real estate held by one other than a dealer for future use *294 or future realization of the increment in value is held for investment and not primarily for sale. Petitioner claims that it merely gave up rental property for more rental property plus raw land, all of which was property held for investment and productive use in petitioner's business. Respondent maintains that Longview was at all times held by petitioner primarily for sale. The reinvestment property was put together by Long Corporation in late 1949. It began developing the tract in 1957. In the same year certain parcels of the tract were transferred to five related development corporations which proceeded to build houses on the property. Beginning in May 1959, the Long interests started selling the first of the 197 single family houses constructed on the tract. By December of that year they had sold 43 houses and there remained 154 as yet unsold. Prior to their investment in the Atlanta properties, the Long interests had constructed war housing projects in the Charleston area, a low-cost single-unit housing project in Puerto Rico, and several highrise apartment houses. The single-unit housing previously built by the Long interests was of a low-cost nature. Their Atlanta development *295 was the highest priced development they had ever built, the houses ranging in price from $17,000 to $22,000. In Puerto Rico they had found that the "lease-option" arrangement was an excellent method of disposing of houses. Not only had they kept the houses almost completely rented at all times but the large majority of them were eventually sold to the lessees in the ensuing years. The leaseoption agreement enabled the prospective purchaser to build up a certain equity in his house over a period of years without fully committing himself to its purchase. Under it every rental payment made by the lessee reduced the option price. Ultimately, at the end of the option period, the option price was zero. Between the first year and the last year there was a proportionate decrease in the option price measured by several factors, as in the case of a typical home mortgage. For example, under a 30-year lease-option an $18,381.68 house could have been purchased after the tenth year for $15,397.78; after the twentieth year for $9,935.49; and after the thirtieth year for nothing. As of August 1, 1960, out of the 154 unsold houses, 102 were under lease-option agreement. Of the 102 lease-option agreements, *296 approximately 50 percent had been entered into prior to December 30, 1959, and the other 50 percent thereafter. The other 52 houses were vacant, that is they were not under sales contract, lease-option, or in any other manner occupied. This issue, narrowed down, is whether Longview was held by petitioner primarily for sale, as contended by respondent, or for productive use in a trade or business or for investment, as contended by petitioner. Petitioner claims that the nature of the holding of Longview by its sister corporations changed from sale to rent before it purchased the property. It points out that the last sale of any house in Longview was in December 1959, that no further sales were made until it began to liquidate its investment in December 1960, and that 102 of the houses in Longview were under lease-option agreements at the time it purchased the property. Petitioner also stresses that it never sold any houses to an individual purchaser, either before or after the purchase of the property, and that it did attempt to continue with the lease-option agreements, having entered into seven new ones subsequent to the August 1, 1960, purchase date. Respondent, on the other hand, *297 contends that the lease-option agreements were nothing more than a device for selling houses and points out that the Long interests sold a large number of houses under similar agreements in Puerto Rico. Respondent admits that he cannot explain the hiatus in the selling of Longview houses from December 1959 to December 1960. However, he maintains that because of petitioner's poor financial situation and the serious lack of cash by the Long interests, petitioner had no choice at the time it purchased Longview but to hold the property primarily for sale. Respondent admits that petitioner never sold houses to any individuals but points out that Longview Realty, which purchased most of the houses from petitioner, was originally established as a selling agency for the homes built in Longview by the five development corporations. Thus, the respondent maintains that it was not necessary for petitioner to sell the houses and that petitioner should not be allowed to avoid the consequences of the frequent sales by virtue of using a different corporation to "mask" the sales. The question is, of course, purely factual. There have been numerous cases turning on the definition of the word "primarily. *298 " Recently the Supreme Court in Malat v. Riddell, 383 U.S. 569 (1966), determined the meaning of the word "primarily" in the context of property being held primarily for sale to customers in the ordinary course of business. At pages 571-572 of its opinion it stated: As we have often said, "the words of statutes - including revenue acts - should be interpreted where possible in their ordinary everyday senses." Crane v. Commissioner, 331 U.S. 1, 6. And see Hanover Bank v. Commissioner, 369 U.S. 672, 687-688; Commissioner v. Korell, 339 U.S. 619, 627-628. Departure from a literal reading of statutory language may, on occasion, be indicated by relevant internal evidence of the statute itself and necessary in order to effect the legislative purpose. See, e.g., Board of Governors v. Agnew, 329 U.S. 441, 446-448. But this is not such an occasion. Nor do we believe that this is such an occasion. A careful reading of the legislative history of section 1033(g) provides us with no reason to give the word "primarily" any but its ordinary *299 everyday meaning. With respect to section 1033(g), as the Supreme Court did with respect to section 1221(1) in Malat, we conclude that "'primarily' means 'of first importance' or 'principally.'" Hence we must decide what the petitioner's principal purpose was at the time it purchased Longview. Respondent argues the economics of petitioner's situation in an effort to show that petitioner had no choice at the time it purchased Longview but to sell all of the property as quickly as possible. He points out that a large portion ($2,282,399.83) of the purchase price represented the assumption of existing mortgages on the property which were secured by the real estate and the houses. Monthly mortgage payments on the mortgages assumed amounted to about $20,000. The balance of the purchase price consisted of two notes to Long Corporation: A secured note in the amount of $1,499,729.75 due at the rate of $500,000 a year, the first payment being due August 1, 1961; and an unsecured note in the amount of $1,608,000 due at the rate of $80,400 a year, beginning August 1, 1964. Petitioner's yearly debt commitments for the first 3 years on the mortgages and notes amounted to approximately threequarters *300 of a million dollars, viz., the $500,000 due on the secured note plus the $20,000 a month due on the mortgages. After the third year these yearly debt commitments dropped to about $320,000, viz., the $80,400 due on the unsecured note plus the $20,000 a month due on the mortgages. The above payment figures are computed on the assumption that petitioner did not sell the properties but held them solely for investment or productive use in petitioner's trade or business. On this basis, respondent maintains that petitioner acquired the property for sale because on August 1, 1960, it knew it would have to sell, and fairly quickly, in order to meet its cash obligations since on that date it had no ready cash. Petitioner's liabilities due within the first year of ownership were almost $750,000. Its tax return for the year ended October 31, 1961, indicates that taxes, insurance, etc., were going to cost it another quarter of a million dollars. Thus, in its first year, the petitioner would have had to raise approximately one million dollars if it was to hold on to the property as an investment. Respondent stresses that the Longs testified as to the tight financial position of their entire interests *301 and then asks where petitioner proposed to get the money to meet its debts except from the sale of the property. Apparently the $1,560,000 received from the United States Government had been loaned to other members of the Long interests and was not readily available. While admitting that its economic difficulties finally forced it to liquidate its investment in Longview, the petitioner contends that if it had been successful in keeping all of the houses occupied under lease-option agreements the investment in Longview would have shown an annual profit and would have increased in value with the passage of years. Petitioner further contends that months before it purchased the property, the nature of the holding of Longview by the five development corporations had changed from one of primarily for sale to one of only for rent, and when it purchased Longview it merely continued the same type of holding. Respondent refuses to believe that all selling activities were suspended in December 1959 but cannot explain why no sales were made subsequent to that month. To us, the only reasonable answer is that the five development corporations were having difficulty in selling the houses. The *302 respondent points out that selling apparently ceased shortly after the five development corporations had their best selling month, yet he assumes that sales would have continued to increase on a monthly basis. We see no justification for this assumption. The uncontradicted testimony was that the Long interests had been too soon with too much; that too many homes had been put on the market at one time in an area that was just beginning to show promise. Consequently, it is not such a great anomaly that the five development corporations suspended sales in December 1959. We think it quite probable that the nature of the holding of Longview by the five development corporations did change substantially, if not completely, prior to petitioner's acquisition of the development from Long Corporation. It is the intent of petitioner and the nature of its holding at the time of acquisition, as measured against subsequent events, that is important in determining a factual matter such as this. Petitioner answers respondent's contention that the lease-option agreements were merely a sales device by showing that neither it nor the five development corporations ever sold a Longview house under one *303 of these lease-option agreements. These agreements had been successfully utilized by a sister corporation to dispose of a great number of low-cost houses in Puerto Rico. However, since the Longview houses were much higher priced than those in Puerto Rico, the lessee-optionees increased their equity so slowly in the Longview houses that it was unlikely that any of them would exercise their option, at least in the first few years of their holding. Almost all of the lease-options were for 30-year periods and had clauses to adjust the rent payments upon changes in tax or utility costs so as to assure petitioner's continuing margin of profit. We agree with respondent that the options to purchase built into the lease options were some indication of petitioner's continuing offer to sell. Nonetheless, we believe that the length of the lease-option agreements and the slow equity buildup more strongly indicate an intent on the part of petitioner to retain ownership of the houses while keeping them occupied and receiving regular monthly payments. The profit margin, assuming complete occupancy of the houses, was not great but, as petitioner stressed, there was a substantial amount of depreciation *304 for which it was also bargaining. We are not inclined to permit respondent to superimpose his own business judgment over that of petitioner. Respondent tells us that if he had been in petitioner's position on August 1, 1960, his primary purpose in acquiring Longview would of necessity have been to sell. L. B. Long, petitioner's president and controlling shareholder, has been a successful businessman for many years. Like any other successful businessman he has taken his chances and occasionally lost. We have his believable testimony that at the time petitioner purchased Longview his sole intent was to fill the remaining unoccupied homes under lease-option agreements and then proceed to develop the remainder of the Longview subdivision by building several industrial parks and a number of highrise rental apartment buildings. This testimony was supported by that of his son, Leonard L. Long, who managed the Long interests in the Atlanta area. The junior Long, who has been and is very active in the commercial and residential development of the entire Atlanta area, clearly described his and his father's plans for the Longview subdivision - none of which contemplated sale of any of the property. *305 The Longview subdivision, in its entirety, was one of the largest packages of realty ever put together by any single interest in the Atlanta area. The property was acquired with great care and forethought and obviously was not an investment that the Long interests intended to turn over in the near future. We think that a combination of circumstances, which came to a head several months after petitioner purchased Longview, forced the liquidation of what we consider petitioner's rental business and investment. Cf. Loughborough Development Corporation, 29 B.T.A. 95 (1933). True, some of the adverse circumstances had already occurred or were foreseeable on August 1, 1960. Some of the other investments by the Long interests were in financial trouble prior to petitioner's investment in the Longview subdivision. Subsequent to this investment the cash picture of the Long interests became even bleaker. Also, at about that time, L. B. Long became seriously ill and unable to cope with the financial problems of his widely held interests. The lease-option agreement with which he had hoped to occupy his houses did not prove as attractive as he had hoped and the cash drain attributable *306 to petitioner's debts became an impossible burden. Longview was the biggest cash drain of all of the investments of the Long interests and was the one chosen to be disposed of when it became apparent that they had to retrench. However, in view of the scope and value of the property, we do not think it unreasonable, as does respondent, that the Long interests made a "last-ditch" attempt to retain the property for use in the ordinary course of business and investment. In reaching our conclusion as to the nature or primary purpose of the holding of Longview by petitioner, we cannot ignore that petitioner never advertised any of the property for sale, solicited any offers, or made any sales to individual purchasers. It did not purchase any other property or improve any of the remainder of the unimproved or partially improved land within the Longview subdivision. These factors would carry more weight if petitioner was endeavoring to prove that it was not in the business of developing and selling. Section 1033(g) speaks only of holding property primarily for sale and does not include a requirement that the sales be made to customers in the ordinary course of business. But these factors *307 do show that petitioner was not preparing the property for sale and they help explain its intent. And when considered in the light of the overall picture of the Long interests' primary concern with building rental housing over the years, they help to convince us that petitioner's original intent at the time it purchased Longview was to hold for rent in the ordinary course of business or for investment. Cf. Loughborough Development Corporation, supra; and Steuart Brothers v. Commissioner, 261 F. 2d 580 (C.A. 4, 1958). Respondent hardly alludes to the raw undeveloped land which made up the majority of the acreage of the Longview subdivision. We believe this is so because there is no indication that this portion of Longview was at any time held primarily for sale. Petitioner neither cleared nor in any manner developed any of the raw land during the period it held the property. The bulk of the undeveloped land was sold to Edwards Engineering Company in one package, and the sale had all the indicia of the liquidation of an investment. Respondent has indicated that this sale to Edwards did not bring the highest price obtainable at that time. However, respondent *308 has introduced no proof of this. In contrast the petitioner has shown us that this sale brought the greatest amount of cash ($500,000) which could be obtained at that time - cash being what the Long interests needed most desperately. We think the property sold to Edwards Engineering Company was not held primarily for sale on August 1, 1960. Respondent has concentrated almost his entire argument towards the 154 houses, and lots upon which they stood, apparently in the belief that, if he proved his claims with respect to the houses, we would find the same type of holding for the entire subdivision. Respondent is correct in assuming that we would find the same type of holding for the entire subdivision, but incorrect in assuming that petitioner's holding was primarily for sale. We believe that on August 1, 1960, petitioner's primary purpose and intent with respect to the Longview subdivision was to rent the houses under lease-option agreements and develop the remainder of the subdivision along the lines of prearranged plans, perhaps with the ultimate intent, at some later date, to sell portions of the property after they had substantially appreciated. We have no doubt that at the *309 time of purchase the petitioner realized that it might be forced to sell the property in the near future if it was not successful in renting the houses. However, any reasonable businessman, upon entering into a new business or investment, realizes that if certain factors change or he has misjudged the utility of the property, he may have to liquidate his investment and sell off the property. Attributing such knowledge to a purchaser is a far cry from attributing to the purchaser a primary intent to hold for sale. Although the Long interests apparently misjudged the market into which they were entering, and perhaps were overly optimistic, we do not believe that there was a primary purpose to hold for sale at the time of purchase on August 1, 1960. The principal or primary purpose for holding property at the time of its sale is also significant in determining the primary purpose for which the property was held (within the meaning of section 1033(g)) during its entire holding period. A conclusion that the property was originally acquired for use in the ordinary course of business or investment is not conclusive because such purpose is subject to change. If the original purpose is replaced *310 by a subsequent one, the purpose of first importance at the time of sale must also be considered. We must examine the entire quantum of the holding, from purchase to sale, in order to determine the primary purpose during such holding. Section 1033(g) says that a taxpayer must reinvest in "like kind" property. The Commissioner's regulations provide that the term "like kind" goes to the nature or character of the property, i.e., the purpose for which it is held rather than to the grade or quality of the property. In other words, for the reinvestment property to be "like kind" it must also be held for use in the ordinary course of business or for investment, and not primarily for sale. If a taxpayer, acting in good faith, locates and purchases property which he intends to hold for the same purpose as the involuntarily converted property, surely Congress did not intend to penalize him if subsequent events, substantially beyond his control, necessitated a change in the purpose of his holding and a reasonably expeditious liquidation of his business or investment. The phrase "held primarily *311 for sale" in section 1033(g) is not modified by the phrase "to customers in the ordinary course of his [taxpayer's] trade or business" as it is in sections 1221(1) and 1231(b)(1)(B). It is because of the omission of this modifying phrase that we cannot allow the final purpose for holding property to be solely determinative. Under sections 1221(1) and 1231(b)(1)(B), a determination that a taxpayer actually went into the business of selling rather than merely liquidating his investment disposes of the issue. Section 1033(g), however, presents us with a broader test, viz., whether the property was "held primarily for sale." The taxpayer's intent at the time of reinvestment becomes particularly important in the type of factual analysis necessary under section 1033(g). Subsequent events are important to the extent that they help us determine exactly what was the original intent and whether it was the primary one during the entire holding period. Since petitioner has convinced us that events beyond its control forced the liquidation of its business or investment, and thus the temporary holding of the property for sale, we must look to the original purpose for buying and holding Longview. *312 From our point of view that purpose was for productive use in its business and for investment. Cf. Winter Holding Corporation, 31 B.T.A. 1185 (1935). Section 1033 provides that gain shall be recognized only to the extent that the amount realized upon an involuntary conversion exceeds the cost of the reinvestment property. Petitioner contends that, to satisfy the provisions of section 1033, it only had to reinvest the net cash amount ($1,560,000) it realized. If petitioner is correct, it would have to recognize no gain from the sale of its Puerto Rican property because of our finding as to the fair market value of the reinvestment property and our conclusion that such reinvestment property was "like kind" property within the meaning of section 1033(g). Petitioner has cited a number of cases involving the condemnation of "Wherry Housing Projects" and has presented an analysis of the legislative history of the Capehart Housing Act which, among other things, provides for the purchase or condemnation of "Wherry Housing Projects" wherever a "Capehart Housing Project" is erected. *313 The purpose of such material is to convince us that only the petitioner's equity, which petitioner claims is measurable only by the cash received, was sold under threat or imminence of condemnation to the United States Government. We think this argument is untenable. The legislative history of the Capehart Housing Act quoted by petitioner is replete with the recognition that not only is the equity of the lessees or owners to be purchased or condemned but also that all mortgages are either to be assumed or paid off. And the very language of the purchase agreement, as set forth in our findings of fact, specifically acknowledges that the United States Government agrees to assume all mortgages on petitioner's Puerto Rican property. Respondent suggests that the real questions to be answered with respect to this issue are: What actually was purchased by the United States Government and does the cash price paid petitioner plus the amount of the mortgages which were assumed constitute the "amount realized" under section 1033? We agree. It is clear from the purchase agreement that the United States Government acquired all the right, title, and interest, both real and personal, which petitioner *314 possessed in its Puerto Rican property. It also assumed all of petitioner's obligations with respect to the property. What was purchased was the petitioner's entire bundle of rights and obligations. Petitioner not only received cash but was also relieved of its personal obligations on the outstanding mortgages. Petitioner cites two cases decided by this Court for the proposition that only the amount actually received by it was required to be reinvested in order to satisfy the provisions of section 1033. These cases are Fortee Properties, Inc., 19 T.C. 99 (1952), reversed 211 F. 2d 915 (C.A. 2, 1964), certiorari denied 348 U.S. 825 (1954); and Frank W. Babcock, 28 T.C. 781 (1957), affd. 259 F. 2d 689 (C.A. 9, 1958). We believe these cases are distinguishable. In both of them, the taxpayers were not personally liable for the indebtedness on the properties condemned. Our opinions and the Ninth Circuit opinion in Babcock make very clear that they so held because the taxpayers did not borrow the money, were never personally benefited by the mortgages, and were not personally obligated to pay the mortgages. In contrast, *315 this petitioner, by its own admission, would still be liable today on the mortgages (which are still outstanding) if the United States Government failed to make timely payments. The United States Government assumed mortgages in excess of $4,000,000 and petitioner was concomitantly relieved of over $4,000,000 in debt, which was its personal obligation. Therefore, the petitioner had to reinvest the entire proceeds of the sale of its Puerto Rican property, $5,952,508.06, in "like kind" property in order to qualify for complete nonrecognition under section 1033. Since we have already found that the fair market value of the entire Longview property was $5,647,000 and that petitioner's reinvestment was in that amount, then it follows that petitioner had recognizable gain, within the meaning of section 1033, of $305,508.06 from the proceeds of its sale of the Puerto Rican property. Now we return to the provisions of section 931 to determine whether any or all of the $305,508.06 gain recognizable by petitioner under section 1033 is excludable from gross income by virtue of meeting the tests of sections 931(a) and (b). We have already noted that under any method of computation petitioner's *316 gross income meets the 80 percent test of section 931(a)(1). The second test to be applied under section 931, that contained in section 931(a)(2)(A), requires that 50 percent or more of the corporation's gross income for the 3-year period immediately preceding the close of the taxable year in question be derived from the active conduct of a trade or business within a possession of the United States. We have already determined that to the extent that petitioner reinvested the gain from the sale of its Puerto Rican properties in "like kind" property within the meaning of section 1033(g), such gain would not be includable in gross income for the purpose of making the computation under section 931(a)(2)(A). We have also determined that, to the extent of $5,647,000, petitioner reinvested the proceeds from the sale of his Puerto Rican property in like kind property within the meaning of section 1033(g). After applying the provisions of section 1033, we have further determined that $305,508.06 represented the amount of recognizable gain to petitioner. Consequently, $305,508.06 represents the portion of the gain realized by petitioner from the sale of his Puerto Rican properties which is includable *317 in gross income for purposes of making the computation set forth in section 931(a)(2)(A). Petitioner's rental income, which respondent concedes was income derived from the active conduct of a trade or business within a possession of the United States for the 3-year period immediately preceding the close of petitioner's taxable year ended October 31, 1958, was $1,095,290.45. This figure and the $305,508.06 represent substantially all of the petitioner's gross income for the period in question and the rental income represents substantially more than 50 percent of the gross income. Thus it is not necessary for us to determine whether or not the gross income realized from the sale of petitioner's Puerto Rican property was derived from the active conduct of a trade or business. But we have yet to apply the exception to section 931(a) which is contained in section 931(b). Section 931(b) provides that all amounts received within the United States, whatever their source, shall be included in gross income despite the provisions of section 931(a). Petitioner maintains that because the $1,560,000 check was immediately forwarded to Puerto Rico from its Charleston, South Carolina, office and *318 was promptly deposited in its Puerto Rican bank account it was not an "amount received" in the United States within the meaning of the law. Respondent contends otherwise. Seemingly, petitioner is asking us to find that actual receipt in Charleston was actual receipt in Puerto Rico because the check was immediately forwarded to Puerto Rico and deposited in its only bank account in Puerto Rico. Petitioner's theory is that since the check was ultimately to end up in Puerto Rico, what happened to it subsequent to its issuance and prior to its deposit is of no consequence. However, the tax law is concerned with what actually happened, not with what could or should have happened. Section 931(b) very specifically provides that all amounts received within the United States by a taxpayer, whose total gross income would otherwise qualify under section 931 for exclusion from gross income, shall be included in such taxpayer's gross income. We assume that Congress intended the word "received" to convey its ordinary legal meaning. United States v. Merriam, 263 U.A. 179 (1923). Petitioner has stipulated that the $1,560,000 check was mailed to its principal office in Charleston, South Carolina, *319 and received there by a corporate officer, T. E. Steadman, Secretary. The purchase agreement of petitioner's Puerto Rican property, submitted by the parties as a joint exhibit, sets forth that petitioner's principal office is in Charleston, South Carolina. The record is completely devoid of any evidence with respect to why petitioner allowed the check to be sent to Charleston, South Carolina, on whose authority it was forwarded to Puerto Rico, and what, if any, authority the secretary of the corporation had with respect to its receipt and negotiation. Without deciding what weight, if any, such evidence might carry, we merely determine that, for the purposes of this case, the receipt of a United States Treasury check by a corporate officer at the corporation's principal office is an amount received within the meaning of section 931(b). To hold otherwise would require us to give a statute, unambiguous on its face, a meaning other than its plain purport. Just as petitioner assumes, without justification, that the check in question was an "amount received" in Puerto Rico, so does the respondent assume, without justification, that the amount of the mortgages on petitioner's Puerto Rican *320 property were amounts received within the United States. Respondent contends that the $1,560,000 check was received in the United States, that the mortgages were held by United States banks, that the sales contract was executed in the United States, and that the corporation's principal office was within the United States. However, it does not necessarily follow from all this that the mortgages assumed by the United States Government were amounts received within the United States. Petitioner asserts that the property was in Puerto Rico, that both title and possession passed to the United States Government on January 1, 1958, in Puerto Rico, and that the United States Government assumed the mortgages in Puerto Rico. A close examination of the purchase agreement compels us to agree with petitioner. The contract of purchase, admittedly negotiated within the United States, was not the actual assumption of the mortgages in question but rather a promise to assume such mortgages on the date that title and possession passed to the United States Government. The contract provided that title would pass to the United States Government on January 1, 1958, and, according to the uncontradicted testimony *321 of L. D. Long, physical possession of petitioner's Puerto Rican property was turned over to the United States on that date. Since the United States Government assumed title to and possession of petitioner's Puerto Rican property, and the mortgages with respect to that property, on January 1, 1958, in Puerto Rico, we conclude that the assumption of the mortgages was the equivalent of an "amount received" in Puerto Rico and not in the United States. Section 1033(a)(3)(A) provides that the gain shall be recognized, if all other prerequisites are met, "only to the extent that the amount realized upon such conversion" exceeds the cost of the reinvestment property. Section 1.1033(a)-2(c)(1), Income Tax Regs., provides, in part, that: (c) Conversion into money or into dissimilar property. (1) If property (as a result of its destruction in whole or in part, theft, seizure, or requisition or condemnation or threat or imminence thereof) is compulsorily or involuntarily converted into money or into property not similar or related in service or use to the converted *322 property, the gain, if any, shall be recognized, at the election of the taxpayer, only to the extent that the amount realized upon such conversion exceeds the cost of other property purchased by the taxpayer which is similar or related in service or use to the property so converted, or the cost of stock of a corporation owning such other property which is purchased by the taxpayer in the acquisition of control of such corporation, if the taxpayer purchased such other property, or such stock, for the purpose of replacing the property so converted and during the period specified in subparagraph (3) of this paragraph. It is clear that the amount realized is the full contract sales price ($5,952,508.06). As previously indicated, the "amount realized" is not limited to the taxpayer's equity in the involuntarily converted property but includes mortgages assumed by the purchaser. Cf. Crane v. Commissioner, 331 U.S. 1 (1947). Accordingly, we hold that the petitioner is taxable on the uninvested proceeds ($305,508.06) which is measured by the difference between the fair market value ($5,647,000) of the reinvestment property and the total proceeds ($5,952,508.06) received on *323 the involuntary conversion. To reflect the conclusions reached herein on the disputed issues, Decision will be entered under Rule 50. Footnotes
*. Out of chronological order for convenience of description.↩
1. All section references are to the Internal Revenue Code of 1954 and the regulations thereunder unless otherwise indicated.↩
2. The pertinent portions of section 1033 are as follows: (a) General Rule. - If property (as a result of its destruction in whole or in part, theft, seizure, or requisition or condemnation or threat or imminence thereof) is compulsorily or involuntarily converted - * * *
(3) Conversion into Money Where Disposition Occurred after 1950. - Into money or into property not similar or related in service or use to the converted property, and the disposition of the converted property (as defined in paragraph (2)) occurred after December 31, 1950, the gain (if any) shall be recognized except to the extent hereinafter provided in this paragraph: (A) Nonrecognition of Gain. - If the taxpayer during the period specified in subparagraph (B), for the purpose of replacing the property so converted, purchases other property similar or related in service or use to the property so converted, or purchases stock in the acquisition of control of a corporation owning such other property, at the election of the taxpayer the gain shall be recognized only to the extent that the amount realized upon such conversion (regardless of whether such amount is received in one or more taxable years) exceeds the cost of such other property or such stock. Such election shall be made at such time and in such manner as the Secretary or his delegate may by regulations prescribe.↩