UNITED STATES of America, Petitioner-Plaintiff,

v.

CERTAIN INTERESTS IN PROPERTY Situate IN the BOROUGH OF BROOKLYN, COUNTY OF KINGS, STATE OF NEW YORK, and Dayton Development Fort Hamilton Corp., et al., Defendants.

No. 60 C.D. 1177.

United States District Court
E. D. New York.

Dec. 21, 1962.

See also 198 F.Supp. 383.

Harry T. Dolan, Sp. Asst. to Atty. Gen. of United States, for petitioner-plaintiff.

Skinner & Bermant, Leddy & Raber, New York City, George B. Kenner, Bernard L. Bermant, Carl J. Moskowitz, New York City, of counsel, for defendants Dayton Development Fort Hamilton Corp. and Fort Hamilton Manor Inc.

BRUCHHAUSEN, District Judge.

The defendants-claimants move for a new trial.

The Government instituted this action to acquire title to leaseholds on apartment buildings erected on the Fort Hamilton Army Base in Brooklyn, New York.

The trial of the action before the court and a jury endured for a period exceeding four weeks.

At the time of the taking on December 15, 1960, the Government was the owner of the land and the buildings. The principal issue at the trial was the value of the leaseholds over and above the mortgages, assumed by the Government. The expiration date of the leaseholds was approximately sixty-five years from the taking date.

■ The buildings were erected by the claimants, pursuant to the so-called Wherry Housing Act, 12 U.S.C. §§ 1748, 1748a. The purpose of the Act was to encourage private enterprise to construct rental housing to serve the needs of personnel at or near military installations and to provide housing at low rentals. The Act authorized the Federal Housing Administration to insure the mortgages up to 90% of the estimated cost of construction, without regard to the risk, upon certification of the necessity by the military. The Government made the land available to the builders at nominal ground rentals. Rental income was predicated upon a return not exceeding 6½% of original cost of the struc-

tures. The permissible rentals including services were controlling in the determination of gross and net income as well as the approved schedule of allowable expenses and cost of management and operation. At such times as operating costs, including vacancy losses fluctuated or changed, it was the policy of the Government to increase or decrease the rental income, as the circumstances warranted. The lessees were not permitted to alter the rent schedule without Government consent.

There was credible evidence that the total cost of the structures was considerably less than the total of the amounts received by the lessees on the mortgages, insured by the Government.

The lessees were required to deposit moneys with the mortgagees for replacements, repairs and deferred maintenance. The sums so deposited totaling approximately $173,000 were returned to the lessees at or about the time of the taking. These funds were in a different category than were annual maintenance expenses.

The Government exercised control of the projects through ownership of the preferred stock of the corporate lessees.

The moving papers, in the main are repetitive of motions and objections, made at the trial.

█ A point now urged is that "the four verdicts rendered by the jury ** were based on unsubstantial evidence as a matter of law **." (Page 2 of the moving affidavit) It would appear that the claimants contend that the verdicts were against the weight of evidence. The parties' expert witnesses were examined and cross-examined at considerable length. It was the province of the jury to ascertain the truth. It should be borne in mind that the burden of proof as to the values of the leaseholds rested upon the claimants.

One of the many factors which a purchaser would consider in negotiating for acquiring the property, as testified to by the experts, was the physical condition of the buildings. Credible evidence

supported the Government's claim that the structures had not been well maintained. No reserve fund would be available to a purchaser to cure these conditions. Joseph Shlichta, the Government's expert, estimated the cost of deferred maintenance and replacements at $250,000, a more conservative estimate than that of Mr. Bingham, another expert for the Government. This item is unrelated to the annual deduction, as a part of operating expense, for replacement reserve, a mandatory deduction prescribed by the Federal Housing Administration rules and regulations.

The appraisers for both parties based their valuations upon computations of the capitalization of income. They differed in respect to the capitalization rate, cost of repairs and replacement, estimated allowance for vacancies and operating expenses.

Seven sales were introduced into evidence by the Government, not as direct proof of value but in aid of arriving at a just capitalization rate. All of them involved properties, financed by Government insured mortgages, under restrictions similar to those imposed on the subject buildings. Two of the sales involved properties in the immediate vicinity of the said buildings, two in the general area and three pertained to sales of Wherry Housing projects in other States. All of the local sales were evidenced by the sale of stock in corporations, organized solely for the purpose of acquiring property for Federal-controlled Housing projects.

In United States v. Tampa Bay Garden Apartments, Inc., 5 Cir., 294 F.2d 598, 605, the Court wrote:

"We do not find that either the Commission or the court excluded consideration of the Wherry project sales as one of the considerable number of factors going into the complicated process of determining the value of a Wherry Act leasehold interest by the capitalization of income method. The Government's apprais-

ers did so consider the other sales giving varying weights to such data."

The claimants' contentions that original cost of the construction was inadmissible, also that reproduction cost is an element in valuation are untenable.

In United States v. 49,375 Square Feet of Land, etc., D.C., 92 F.Supp. 384, Judge Kennedy, writing for this Court stated that "the reproduction method is in itself absurd in the ordinary case, because even in ordinary times it is ridiculous to suppose that anyone would think of reproducing this or any like property, and that same thing would be true in the vast majority of cases."

The Court of Appeals for the Second Circuit affirmed on Judge Kennedy's opinion, United States v. Tishman Realty & Const. Co., 193 F.2d 180. Certiorari was denied, 343 U.S. 928, 72 S.Ct. 761, 96 L.Ed. 1338.

The said action involved a non-Wherry property. The unique factors pertaining to construction and operations under the Wherry Housing Act established that the return shall be based upon original cost rather than reproduction, as was held in United States v. Benning Housing Corporation, 5 Cir., 276 F.2d 248, 252, wherein the Court wrote, viz.:

"The projects were constructed under the aegis of the Wherry Act, which was enacted on August 8, 1949, in an attempt to relieve an acute shortage of housing which existed at that time at military installations throughout the country. The Act envisioned the construction of this needed housing by private builders and its provisions were consequently specifically designed to remove what appeared to its chief proponents to be the major impediments to such construction. The then current view of the problem was concisely expressed by Senator Wherry himself:

" 'There are three requisites that must be provided in this legislation if it is to be successful: The program must be attractive to the builder or else you will get no construction; it must be attractive to the mortgage banker who supplies the money; the project must be made attractive to the Federal Housing Authority to enable it to set rental prices within the reach of families in the lower income brackets as well as in the higher brackets.'

"The Wherry Act proposed to meet these requisites by providing for: (1) the elimination of land and acquisition costs by the leasing of land on military installations on long-term, irrevocable leases at nominal rentals; (2) a special form of mortgage insurance which avoided the problem created by the fact that ordinary F.H.A. mortgage insurance was unavailable because of the risk involved by reason of the location of the needed housing and the question as to the permanent nature of the military installations; and (3) F.H.A. control over the rents which could be charged for housing constructed under this plan.

"Considered in the light of the purposes of the Wherry Act, the proper resolution of the controversy seems clear. The condemnees' argument rests squarely upon a basic misconception of those purposes. For condemnees presuppose that the inducements offered by the Wherry Act to stimulate building, i. e., leases at nominal rentals and Government-insured mortgages, were outright gifts to the Wherry sponsors for which the Government would not, and, indeed, could not, exact a return. Such is not the proper interpretation of that Act. These inducements were offered in return for low cost housing. It is clear that the policy has consistently been one of allowing a return based upon original cost rather than reproduction. Rent increases were sanctioned only to offset rising operating costs and not to compensate for increased reproduction costs. The Act did not

contemplate that sponsors would recover reproduction costs on a sharply rising market. And there was nothing unfair in its failure to do so. By insuring the mortgages on the projects, the Government assumed the risk of loss on a declining market. In such a situation, respect for the public interest practically required that no benefit should accrue to the sponsors as a consequence of inflation.

"This conclusion is reinforced by the fact that the record is totally devoid of any unequivocal evidence that the project here involved would be reproduced by private investors at the risk of private capital. That reproduction would not occur under those circumstances in the vast majority of the cases is almost certain. Indeed, the Wherry Act was originally passed primarily because private investment was not providing such projects. We find nothing in the record to indicate that the situation at Fort Benning differs from this norm.

"We conclude, therefore, that this is not a proper case for valuation on the basis of reproduction cost. This means, of course, that the case must be tried on the basis of comparable sales, capitalization of income and original cost."

In a later case, United States v. Leavell & Ponder, Inc., 286 F.2d 398, the same Court of Appeals again held evidence of reproduction cost inadmissible. Certiorari was denied, 366 U.S. 944, 81 S.Ct. 1674, 6 L.Ed.2d 855.

Now that verdicts have been rendered for a total sum, considerably less than the amount deposited in court by the Government, the claimants for the first time and as part of the present motion seek to introduce evidence of the amount of such deposit made at the time of filing the declaration of taking. The said declaration, pursuant to 40 U.S.C. § 258a contained "a statement of the sum of money estimated * * * to be just compensation for the land taken." Neither party, in conformity with settled law, offered evidence at the trial of the making of the deposit or the amount thereof. Such proof is likewise inadmissible at this time.

The gravamen of claimants' presentation is that the jury should have accepted the valuations of its principal expert rather than those of the Government. The aggregate valuations of the claimants were two and three quarter times those of the Government. It was evident to the trial judge and surely to the jury that either expert must have committed grievous errors in the process of arriving at the true values. The cross examination of Mr. Tuchler, the claimant's expert, brought to light the weakness of his position. The jury was justified in rejecting his opinion.

The motion is in all respects denied and it is so ordered.