FORT HAMILTON MANOR, INC., PETITIONER *v.* COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT

DAYTON DEVELOPMENT FORT HAMILTON CORP., PETITIONER *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 2709–65, 2710–65.    Filed February 4, 1969.

*Martin Rosen* and *Arthur Pelikow*, for the petitioners.
*John B. Murray, Jr.*, for the respondent.

ATKINS, *Judge:* The respondent determined income tax deficiencies
against the petitioner Fort Hamilton Manor, Inc., for the taxable
years ended May 31, 1961 and 1962, in the respective amounts of
$362,058 and $12,705 and against the petitioner Dayton Development
Fort Hamilton Corp. for the taxable year ended November 30, 1961,
in the amount of $158,659.

The issues are (1) whether under section 1033 of the Internal Rev-
enue Code of 1954, gains realized by the petitioners in their taxable
years ended May 31 and November 30, 1961, upon the taking of their
property by the United States under condemnation proceedings, may
be excluded from gross income, and (2) whether salaries paid by the
petitioners to their officers for such taxable years exceeded a reasonable
allowance for compensation for services rendered by such officers
within the meaning of section 162(a)(1) of the Code. The deficiency
determined by the respondent against Fort Hamilton Manor, Inc., for
the taxable year ended May 31, 1962, results entirely from the dis-
allowance of a claimed net operating loss deduction consisting of a
carryover from the taxable year ended May 31, 1961. The allowance
of such net operating loss deduction depends upon our resolution of
issues (1) and (2) above.

FINDINGS OF FACT

Some of the facts were stipulated and are incorporated herein by
this reference.

The petitioners, Fort Hamilton Manor, Inc. (hereinafter sometimes
referred to as Fort Hamilton), and Dayton Development Fort Hamil-
ton Corp. (hereinafter sometimes referred to as Dayton Development)
are corporations organized under the Stock Corporations Law of the
State of New York (N.Y. Stock Corp. Law sec. 2) on April 21, 1950,

and October 21, 1949, respectively, for the purpose of the construction and operation of rental housing projects. Each petitioner maintained its principal place of business at Rockaway Beach, N.Y., on the date the petitions were filed herein.

Fort Hamilton filed corporate income tax returns for the taxable years ending May 31, 1961 and 1962, and Dayton Development filed its return for the taxable year ended November 30, 1961, with the district director of internal revenue, Brooklyn, N.Y. Each petitioner used an accrual method of accounting. The stockholders and officers of each petitioner were four brothers, whose respective ownership interests and offices held were as follows:

| Name | Percentage of stock held | Office held |
|---|---|---|
| William Zukerman | 25 | President. |
| Charles Zukerman | 25 | Treasurer. |
| Sidney Zukerman | 25 | Vice-president. |
| Solomon Zukerman | 25 | Secretary. |

Sometimes hereinafter such individuals will be referred to collectively as the Zukermans. In all transactions William Zukerman took a leading role and acted on behalf of all the brothers and their various interests.[1]

By leases dated March 9, 1950, and June 6, 1950, the United States leased to Dayton Development and Fort Hamilton, respectively, land in Brooklyn, N.Y., for a period of 75 years for the purpose of constructing and owning Wherry housing under title VIII of the National Housing Act (63 Stat. 570) to be rented to military and civilian personnel of the armed services of the United States. The petitioners constructed a total of 682 residential units on the land leased to them and were at all times the owners of such leaseholds and rental projects, paying ground rents to the United States in accordance with the terms and provisions of the leases.[2]

In 1957 the petitioners received notice from a representative of the Department of the Army that such department had approved the construction of Capehart housing near the petitioners' Wherry projects, and that it was mandatory, under the Housing Amendments of 1955 (69 Stat. 652) as amended (70 Stat. 1091), that the Department of the Army acquire the petitioners' Wherry leaseholds and housing projects through purchase or other means of transfer or, if the parties could not agree on terms for acquisition, by condemnation.

---

[1] The Zukermans also had other interests. They had owned a corporation which owned a housing project in Newburgh, N.Y. That corporation received an award for the taking of the housing project and was dissolved, the Zukermans, as a partnership, receiving the proceeds of that award which they held for the purpose of investments in other property.

[2] Each lease provided that title to all improvements constructed by the lessee should remain in the lessee, except that upon expiration or earlier termination of the lease such improvements should become the property of the lessor unless the lessee should elect to remove the improvements and restore the premises.

Upon receiving this notice that their Wherry housing projects were to be acquired by the Army, the petitioners commenced a search for income-producing properties to replace such properties.[3] A mortgage broker furnished the Zukermans with a list of 12 to 15 locations that New York City was interested in redeveloping by construction of housing projects. The Zukermans selected one of the sites listed in the Rockaway section of Queens County, N.Y., and asked the broker to start negotiations with the slum clearance committee of New York City to obtain for them the right to build on the site. This committee required the elimination of slum conditions existing at the site and the construction of apartment houses thereon to be rented to people in the middle-income range. Petitioners' president, William Zukerman, met on numerous occasions with the slum clearance committee in efforts to obtain a contract to construct an apartment house project on the Rockaway site. The committee was concerned about the financial ability and the responsibility of the Zukermans and their various interests to fulfill such a contract. Zukerman informed the committee that the petitioners' financial position would be improved upon the receipt of payment of the proceeds from the condemnation of their Wherry housing projects, and showed the committee the above-mentioned notice received by both petitioners from the Army. The fact that the petitioners were expected to shortly receive such payment from the Department of the Army weighed heavily in the committee's decision to award the contract to the Zukerman interests. In fact, the committee had informed Zukerman that the Zukerman interests would be insufficiently capitalized to acquire such contract without the condemnation award.

Under the housing project a total of 15 apartment buildings were to be constructed at a total estimated cost of $70 million. The land involved in the project could be conveyed by New York City only to a redevelopment company organized in accordance with the Redevelopment Companies Law of New York State (N.Y. Unconsol. Laws secs. 3401–3426 (McKinney 1949)). Therefore, two redevelopment companies were organized by the Zukermans on March 5, 1959. One of such companies, named Dayton Seaside Corp. (hereinafter called Seaside), was organized to construct six buildings referred to as the Seaside Rockaway project. Another corporation was organized to construct the other nine buildings in another part of the housing project, but such corporation is not involved herein.

On October 8, 1959, an agreement was entered into between New York City and Seaside in regard to the acquisition and development of land

---

[3] The petitioners' tax advisers had informed them of the possible Federal tax consequences with respect to proceeds which might be received upon the condemnation of their property, and the petitioners were aware that, unless such proceeds were reinvested in similar property pursuant to the provisions of sec. 1033, I.R.C. 1954, any gain derived upon the condemnation would be taxed when realized.

known as the Seaside Rockaway Urban Renewal Area in accordance with the urban renewal plan contained in the agreement. Such agreement required Seaside to construct low-cost or middle-income housing in accordance with the terms contained therein. Therein the City, pursuant to the Redevelopment Companies Law, exempted from certain local and municipal taxes, for 25 years, 40 percent of the increase in value of the property included in the project, such exemption to take effect upon completion of the project or any building therein. The agreement further provided in part as follows:

905. Except as provided herein and in Paragraph 906 and 907 hereof, the Housing Company may not sell the real property in the Site or any part or section thereof until completion of the entire project. However, the Housing Company, with the consent and approval of the Board of Estimate, may sell the project or any building therein after completion by the Housing Company of all construction work thereon, provided that the instruments of conveyance include such covenants and requirements as are necessary to carry out the pertinent provisions of this Agreement.

906. Subject to the anti-speculation provisions of Paragraphs 805 and 806, and notwithstanding anything to the contrary in this Agreement, the Housing Company may convey the fee title of any building or buildings in the project, or may make leases of any building or buildings in the project to subsidiary or affiliated corporations, or merged corporations, organized under Redevelopment Companies or Public Housing Laws, provided that such corporations consist of the stockholders of the Housing Company, provided, however, that the Housing Company shall not be relieved of its obligations to effectuate the housing project as in this Agreement provided, and further provided, however, that the grantees and/or lessees assume the obligations of this Agreement in writing, but only with respect to the particular portion of the area conveyed or leased.

907. In the event the Housing Company should desire to convey the entire housing project (or that portion of the housing project remaining after any conveyance or conveyances pursuant to Paragraphs 905 and 906) before the Housing Company has completed the construction of the buildings and improvements required to be provided under this Agreement and the Redevelopment Plans Schedules C-1 and C-2 of this Agreement, and the Board of Estimate approves such conveyance, the consideration for such conveyance paid or payable to the Housing Company shall not exceed an amount representing the actual cost to the Housing Company of the project (including carrying charges and the cost of any improvements thereon and administrative relocation costs specified in Paragraph 508E, and demolition costs incurred, to the extent not reimbursed from income derived from the temporary operation of the realty). The intent and purpose of this Paragraph is to preclude the Housing Company's making any profit resulting from conveyance of the housing project prior to the completion of the buildings and other improvements thereon required to be constructed under this Agreement and the Redevelopment Plans. In the event of any conveyance under this Paragraph, the grantee shall be required to assume all of the obligations of the Housing Company under this Agreement. Such grantee must be a qualified redeveloper who is financially able to proceed with the project in accordance with this Agreement and the Redevelopment Plans.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

912. This Agreement shall enure to the benefit of and be binding upon any successor of any party hereto, but this provision shall not operate to permit any

assignment or other voluntary transfer of any of the rights created hereunder except in such manner as may be expressly permitted by this Agreement and the Redevelopment Companies Law.

The land described in the agreement was conveyed to Seaside by New York City on November 2, 1959, at an upset price of $2,019,962. Seaside financed the acquisition by giving New York City a purchase-money mortgage in the amount of $1,346,641.33, and paying the remainder in cash. The cash was obtained in part by a loan of about $500,000 obtained by the Zukermans from the Chemical Bank of New York. The note the Zukermans gave the bank for the loan was endorsed by the petitioners, and the Zukermans pledged with the bank their stock in the petitioners as collateral for the loan.

On December 15, 1960, the United States by a declaration of taking filed with the U.S. District Court for the Eastern District of New York took for public use all the petitioners' interests under the Wherry housing leases, subject to the indentures of mortgage on the leaseholds. In connection with such condemnation action, the United States deposited with the register of the District Court the sums of $880,000 and $370,000 as estimated just compensation for such interests of the petitioner Fort Hamilton and the petitioner Dayton Development, respectively. In January and February of 1961 the petitioners withdrew such sums from the District Court (after having posted appropriate bonds), and applied about $488,000 of the money to repay the Chemical Bank loan (whereupon the stock of the petitioners which had been pledged was returned to the Zukermans) and the rest of it was advanced to Seaside for use in the Seaside Rockaway project. In addition to these condemnation awards, the Zukermans used funds of approximately $1 million from their various interests to finance Seaside's operations.

On March 15, 1961, Seaside executed separate agreements with each of the petitioners under which Seaside agreed to sell and convey and each petitioner agreed to purchase, a plot of land and a building to be erected thereon in the Seaside Rockaway project. The two buildings involved were expected to be the first completed in such project. The substantive provisions of these agreements were identical. Therein it was recited that the petitioner's property had been condemned by the United States on December 15, 1960, and that the petitioner desired to reinvest "the proceeds of any award in condemnation resulting from said involuntary conversion." It was provided in the agreements that the purchase price of the land and buildings would be actual cost, and that the purchase price should be paid by assuming a mortgage guaranteed by FHA.

Each agreement also provided, in part, as follows:

It is understood that [the petitioner] has already advanced and shall continue to advance sums of money to Seaside which said monies shall be entered upon

the books of Seaside as being payments against the purchase price * * *. Any sums that may have been turned over by [the petitioner] to Seaside in excess thereof shall be carried on the books of said corporation as a loan. Such sums as are loaned to Seaside shall bear interest at the rate of 6% and shall be payable after the transfer of title herein on demand but in no event sooner.

The Deed to be delivered to [the petitioner] by Seaside shall be in the same form as the conveyance made by the City of New York to Dayton Seaside Corp. on November 2, 1959 and the Deed shall be delivered within 90 days after the issuance of a Certificate of Occupancy on the building to be constructed by Seaside.

Seaside warrants that at the time of delivery of the Deed it shall transfer title free and clear of all encumbrances other than the first mortgage heretofore referred to. * * * All unpaid taxes, easements, water charges and sewer rents shall be apportioned as of the date of title between the parties.

. *　　　*　　　*　　　*　　　*　　　*　　　*

It is understood and agreed between the parties that said property is eligible for tax abatement in accordance with the certain agreement dated November 2, 1959 between Dayton Seaside Corp. and the City of New York. In the event that a record conveyance of said property may result in the loss of said tax abatement, it is agreed that the Deed referred to in this agreement shall be executed and delivered by Seaside to [the petitioner] but shall not be recorded until such time as said recording will not result in the loss or forfeiture of said tax abatement. * * * It is understood and agreed that at all times after the execution of said Deed that as between the parties hereto ownership shall be in [the petitioner] and that [the petitioner] shall receive all the rents and profits from said real property and shall be liable for all expenses and charges relating thereto. It is the understanding of the parties that in the event that said title is not recorded Dayton Seaside Corp. shall act as the nominee and record owner on behalf and instead of [the petitioner].

Construction of the two buildings was started in April 1962. Each of the buildings was required to be constructed by a separate corporation under the rules of the Federal Housing Administration, which insured the loans used to finance the construction of the buildings. Accordingly, in order that the two buildings contemplated in the above-mentioned agreements dated March 15, 1961, could be constructed, Seaside, by deed dated April 23, 1962, for a stated consideration of $534,000, conveyed to a redevelopment company owned by the Zukermans, Dayton Seaside No. 2 (referred to as Seaside No. 2), the land which it had previously agreed (on Mar. 15, 1961) to convey to petitioner Dayton Development, but retained the land it had agreed to convey to petitioner Fort Hamilton.[4] These two buildings were constructed for Seaside and Seaside No. 2 by Dayton Contracting, another corporation owned by the Zukermans. They were completed for occupancy on September 9, 1963, and October 7, 1963, and certificates of

---

[4] It also conveyed a part of the land to a corporation named Dayton Seaside No. 3 for the construction of another building and in 1964 or 1965 sold the rest of the land to a corporation named Dayton Towers Corp. (in which the Zukermans had no interest) to carry out the construction of the remaining three buildings. The consideration for these transfers is not shown.

occupancy were issued to Seaside and Seaside No. 2 on October 11, 1963. Seaside and Seaside No. 2 conveyed the two buildings and the land which they occupied by separate deeds dated October 11, 1963, to petitioner Fort Hamilton and petitioner Dayton Development, respectively, subject to first mortgages. The deeds were not recorded. The petitioners' attorney informed New York City of the conveyances.

Seaside and Seaside No. 2 each submitted to the Federal Housing Administration on November 18, 1963, and December 13, 1963, respectively, a "mortgagor's certificate of actual cost" of the improvements stating that the costs were $5,214,309.29 and $5,137,385.15, respectively. Tenants began to occupy the two buildings in 1963. The nominal lessor of the apartments was Seaside. The rental income was collected by Dayton Management, a partnership composed of the Zukermans.[5]

The issue of just compensation to the petitioners for the condemnation of their property by the United States was tried in the U.S. District Court, Eastern District of New York, and resulted in a judgment on November 5, 1962, that the fair value and just compensation which was due petitioner Fort Hamilton and petitioner Dayton Development was $675,000 and $200,000, respectively. Accordingly, they were ordered to pay the United States $205,000 and $170,000, respectively, representing the difference between the amount of the United States' deposit previously withdrawn by each petitioner and the amount of just compensation determined. (*United States* v. *Certain Interests in Property, Etc.* (E.D.N.Y.) 212 F. Supp. 88, affd. (C.A. 2) 326 F. 2d 109, certiorari denied 377 U.S. 978.) A certificate of satisfaction of the judgment granted the United States against the petitioners, dated January 18, 1965, was filed in the District Court.

After the United States had condemned and obtained possession, on February 1, 1961, of the petitioners' interests in the Wherry projects, the Zukermans, as officers of the petitioners, continued to render services for the petitioners throughout the year 1961 with respect to the ligitation arising out of the condemnation, including the issue of just compensation to be paid petitioners for the condemned property. They also conferred with architects, engineers, and city officials, and employees with regard to the Seaside Rockaway project, and supervised demolition of existing structures preparatory to construction of the new buildings.

---

[5] Seaside and Seaside No. 2 filed Federal income tax returns for their respective taxable years ended Sept. 30, 1963 and 1964, and Mar. 31, 1963 and 1964, but therein reported no gains or income and no deductions. In its return for the taxable year ended May 31, 1964, petitioner Fort Hamilton reported, among other things, rental income of $93,692, and deducted $103,027.31 for depreciation on a building and $40,763.83 for New York City real estate taxes. In its return for the taxable year ended Nov. 30, 1964, petitioner Dayton Development reported, among other items, rental income of $117,160.50, and deducted $98,856.84 for depreciation and $27,656.51 for New York City real estate taxes.

In its income tax return for the taxable year ended May 31, 1961, petitioner Fort Hamilton reported a net operating loss of $47,871. Therein it reported that it had realized gain on the condemnation of its property by the United States as follows:

| | |
|---|---:|
| Gross sales price | $4, 598, 500 |
| Less adjusted basis of property | 3, 148, 986 |
| Gain | 1, 449, 514 |

However, such gain was not included in gross income, the petitioner stating in the return that it "elects to treat gain * * * as involuntary conversion" under section 1033 of the Internal Revenue Code. In such return it claimed a deduction for officers' compensation paid the Zukermans in the total amount of $40,000 ($10,000 each).

In its return for the taxable year ended November 30, 1961, petitioner Dayton Development reported that it had realized gain on the condemnation of its property by the United States as follows:

| | |
|---|---:|
| Gross sales price | $1, 587, 018 |
| Less adjusted basis of property | 950, 831 |
| Gain | 636, 187 |

However, such gain was not included in gross income, the petitioner stating in the return that it "elects to treat gain * * * as involuntary conversion" under section 1033 of the Code.[6] In such return the petitioner claimed a deduction for officers' compensation paid to the Zukermans in the total amount of $4,000 ($1,000 each).

In the notice of deficiency the respondent determined that the petitioners Fort Hamilton and Dayton Development realized long-term capital gains from the conversion of their interests in the Wherry projects in their taxable years ended May 31, 1961, and November 30, 1961, respectively, in the respective amounts of $1,365,578 and $634,-635,[7] and that such gain is to be recognized in those years. He stated, in explanation of his determination with respect to the petitioner Fort Hamilton: "Since the provisions of section 1033 of the Internal Rev-

---

[6] Pursuant to authority granted in sec. 1933(a)(3)(B)(ii) of the Code the district director on July 23, 1962, granted petitioner Fort Hamilton an extension of time within which to replace its condemned property to May 31, 1963. The period within which petitioner Dayton Development could replace its condemned property and meet the requirements of sec. 1033(a)(3)(B)·(i) expired Nov. 30, 1962. On Oct. 25, 1962, petitioner Dayton Development requested an extension of time to Nov. 30, 1963. After granting oral hearings and affording the petitioner opportunity to present facts and arguments, the district director by letter of Mar. 4, 1964, denied the request, setting forth his reasons.

[7] The difference between the amounts of the gains reported on the condemnation by the petitioners and the amounts of such gains determined by the respondent results from respondent's disallowance of depreciation claimed by the petitioners in the year of condemnation. Such adjustments increased the adjusted bases of the petitioners' properties and, accordingly, reduced the capital gains on the transactions. Respondent now concedes that such depreciation is allowable, but he has not requested an increase in the capital gains.

enue Code of 1954 were not met, you are not permitted to defer the gain on the involuntary conversion." In explanation of his determination with respect to the petitioner Dayton Development the respondent stated: "The election to defer the gain on an involuntary conversion occurring on December 16, 1960, under Internal Revenue Code Section 1033 is not permitted. No replacement has been made within the purview of the aforementioned section."

In the notices of deficiency the respondent disallowed $16,000 of the $40,000 claimed by petitioner Fort Hamilton as a deduction for officers' compensation for the taxable year ended May 31, 1961, and $2,000 of the $4,000 claimed by petitioner Dayton Development as a deduction for officers' compensation for the taxable year ended November 30, 1961, on the ground that such disallowed portions constituted excessive compensation.

As a result of the adjustments made by respondent with respect to the petitioner Fort Hamilton, he determined that such petitioner did not have a net operating loss for the taxable year ended May 31, 1961, and he accordingly disallowed in full the net operating loss deduction claimed by Fort Hamilton for the taxable year ended May 31, 1962, as a carryover from the taxable year ended May 31, 1961.

A reasonable allowance for compensation for services rendered by the petitioner Fort Hamilton's officers and the petitioner Dayton Development's officers for the taxable years ended May 31, 1961, and November 30, 1961, respectively, is $30,000 and $4,000, respectively.

OPINION

The primary issue is whether the gains realized by the petitioners upon the conversion, as a result of condemnation, of their Wherry housing properties in their taxable years ended May 31, 1961, and November 30, 1961, respectively, are entitled to the benefit of the nonrecognition provisions of section 1033 of the Internal Revenue Code of 1954.[8] That section provides that if the taxpayer, during the period

---

[8] Sec. 1033 provides, in pertinent part, as follows:

(a) GENERAL RULE.—If property (as a result of its destruction in whole or in part, theft, seizure, or requisition or condemnation or threat or imminence thereof) is compulsorily or involuntarily converted—

\*       \*       \*       \*       \*       \*       \*

(3) CONVERSION INTO MONEY WHERE DISPOSITION OCCURRED AFTER 1950.—Into money or into property not similar or related in service or use to the converted property, and the disposition of the converted property (as defined in paragraph (2)) occurred after December 31, 1950, the gain (if any) shall be recognized except to the extent hereinafter provided in this paragraph:

(A) NONRECOGNITION OF GAIN.—If the taxpayer during the period specified in subparagraph (B), for the purpose of replacing the property so converted, purchases other property similar or related in service or use to the property so converted, or purchases stock in the acquisition of control of a corporation owning such other property, at the election of the taxpayer the gain shall be recognized only to the extent that the amount realized upon such conversion (regardless of whether such amount

specified therein, for the purpose of replacing property involuntarily converted, purchases other property similar or related in service or use to the property so converted, the gain upon the conversion shall be recognized only to the extent that the amount realized upon the conversion exceeds the cost of such other property.

When, in 1957, the petitioners learned that their Wherry housing properties were under the threat of condemnation by the Army, the Zukermans, who were the officers and stockholders of the petitioners and who also owned other interests, began negotiations with New York City to obtain the right to construct, under an urban renewal plan, a housing project in the Rockaway section of Queens County, N.Y. Their purpose was to replace the Wherry properties which the petitioners had owned with a portion of the property comprising the housing project in the Rockaway section. The Zukermans were successful in their negotiations. Under the Redevelopment Companies Law (N.Y. Unconsol. Laws secs. 3401-3426 (McKinney 1949)) it was required that the property be held by a corporation created thereunder, known as a redevelopment company. The petitioners were not redevelopment companies. The Zukermans at that time created two redevelopment companies to acquire the land. We are concerned here with only one of those companies, Seaside.

On November 2, 1959, Seaside acquired land from New York City at a cost of $2,019,962 for the purpose of constructing thereon six apartment buildings. On March 15, 1961, Seaside entered into an

---

is received in one or more taxable years) exceeds the cost of such other property or such stock. Such election shall be made at such time and in such manner as the Secretary or his delegate may by regulations prescribe. * * *

* * * * * * *

(B) PERIOD WITHIN WHICH PROPERTY MUST BE REPLACED.—The period referred to in subparagraph (A) shall be the period beginning with the date of the disposition of the converted property, or the earliest date of the threat or imminence of requisition or condemnation of the converted property, whichever is the earlier, and ending—

(i) one year after the close of the first taxable year in which any part of the gain upon the conversion is realized, or

(ii) subject to such terms and conditions as may be specified by the Secretary or his delegate, at the close of such later date as the Secretary or his delegate may designate on application by the taxpayer. Such application shall be made at such time and in such manner as the Secretary or his delegate may by regulations prescribe.

* * * * * * *

(g) CONDEMNATION OF REAL PPOPERTY HELD FOR PRODUCTIVE USE IN TRADE OR BUSINESS OR FOR INVESTMENT.—

(1) SPECIAL RULE.—For purposes of subsection (a), if real property, not including stock in trade or other property held primarily for sale) held for productive use in trade or business or for investment is (as the result of its seizure, requisition, or condemnation, or threat or imminence thereof) compulsorily or involuntarily converted, property of a like kind to be held either for productive use in trade or business or for investment shall be treated as property similar or related in service or use to the property so converted.

agreement with each of the petitioners herein whereby it agreed to sell and convey to each petitioner, at cost, and each petitioner agreed to purchase, a plot of land and a building to be erected thereon in the project. In each contract it was recited that the petitioner desired to reinvest the proceeds of its condemnation award in such property. The petitioners had theretofore withdrawn from the register of the U.S. District Court amounts which had been deposited as estimated just compensation, namely, $880,000 in the case of petitioner Fort Hamilton, and $370,000 in the case of petitioner Dayton Development Co. and had turned over such money to or for the use of Seaside. In the agreements of March 15, 1961, it was provided that the sums which had been advanced and which might be subsequently advanced should be credited against the purchase price of the properties to the petitioners and that any amount which might be advanced in excess of the purchase price should be treated as an interest-bearing loan to Seaside. Each contract provided that Seaside should deliver a deed to the petitioner within 90 days after the issuance of a certificate of occupancy of the building to be constructed. For purposes of acquiring financing for the construction, Seaside transferred the land which was the subject of the contract with the petitioner Dayton Development to another development company owned by the Zukermans, namely, Seaside No. 2, for the purpose of obtaining financing by the Federal Housing Administration. Construction of the two buildings in question was commenced in April 1962 and was completed in September and October 1963. On October 11, 1963, Seaside and Seaside No. 2 executed deeds to the land and buildings in favor of the petitioners..

It is the position of the respondent that since the period within which the petitioners, Dayton Development Co. and Fort Hamilton, might purchase property for purposes of the application of section 1033 expired on November 1, 1962, and May 31, 1963, respectively, the deeds executed on October 11, 1963, did not accomplish a timely replacement of the petitioners' Wherry properties; indeed, he claims that the properties have in reality never been transferred to petitioners, pointing out that the deeds have not been recorded. The respondent also states on brief, without detailed argument, that the petitioners have not shown that the property claimed by them to have been purchased for replacement was similar or related in service or use to the condemned property, within the meaning of section 1033 (a) and (g) of the Code. We think, however, that either the land, or the land and buildings, in the Seaside Rockaway project would constitute property

similar or related in service or use to the Wherry properties which had been condemned.[9]

The petitioners contend that the contracts which they entered into with Seaside on March 15, 1961, a date well within the statutory period for replacement, vested in them equitable ownership of the replacement property, their position being that at that time they assumed the burdens and benefits of ownership of such property, Seaside and Seaside No. 2 being conduit corporations serving no corporate purpose except to hold legal title for them. They emphasize the fact that the Zukermans were the officers and stockholders of both petitioners and of Seaside and Seaside No. 2, and state that this provided assurance that the contracts would be carried out. Presumably their argument is that therefore Seaside and Seaside No. 2 should be disregarded and their purchase and ownership should be attributed to petitioners. They also seem to contend, apparently in the alternative, that there existed the relationship of principal and agent between them and Seaside and Seaside No. 2, with the result that the purchase and ownership of Seaside and Seaside No. 2 should be attributed to them. They therefore take the position that they timely purchased the replacement properties each at a cost in excess of $5 million, and that since such cost exceeded amounts realized by them from the conversions ($4,598,500 in the case of the petitioner Fort Hamilton and $1,587,018 in the case of the petitioner Dayton Development), no portion of the gain is recognizable under section 1033(a).

Although it was the intention of the petitioners to replace the condemned Wherry properties with portions of the Seaside Rockaway project, we are of the opinion that they did not "purchase" such properties within the meaning of section 1033 within the period provided by that section. We think it must be considered that Seaside and Seaside No. 2 purchased such properties and owned them throughout such period, and that the earliest date that it might be considered that the petitioners purchased the properties would be October 11, 1963, when Seaside and Seaside No. 2 executed deeds to them.

It is well established that in general the corporate identity must be respected for tax purposes. As stated by the Supreme Court in *Moline Properties* v. *Commissioner*, 319 U.S. 436:

---

[9] After enactment of sec. 1033(g) by sec. 46 of the Technical Amendments Act of 1958, effective as to dispositions of condemned properties occurring after Dec. 31, 1957, the respondent issued sec. 1.1033(g)–(1) of the Income Tax Regulations which provides that in determining whether replacement property is property of a like kind reference is to be had to sec. 1.1031(a)–1(b) which states in part:

words "like kind" have reference to the nature or character of the property and not to its grade or quality. One kind or class of property may not * * * be exchanged for property of a different kind or class. The fact that any real estate involved is improved or unimproved is not material, for that fact relates only to the grade or quality of the property and not to its kind or class. * * *

The doctrine of corporate entity fills a useful purpose in business life. Whether the purpose be to gain an advantage under the law of the state of incorporation [2] or to * * * serve the creator's personal or undisclosed convenience,[5] so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity. * * * [Footnotes omitted.]

See also *Vim Securities Corporation* v. *Commissioner*, (C.A. 2) 130 F. 2d 106, affirming 43 B.T.A. 759, certiorari denied 317 U.S. 686; *Feinberg* v. *Commissioner*, (C.A. 8) 377 F. 2d 21, affirming 45 T.C. 635; and *Dorothy C. Thorpe Glass Mfg. Corp.*, 51 T.C. 300 (1968). Here Seaside was formed as a redevelopment company under the Re-development Companies Law of the State of New York since it was necessary to have such a redevelopment company acquire the property from New York City. By virtue of the status of Seaside as a redevelopment company, a partial exemption of the property from local and municipal taxes was obtained. Seaside No. 2 was formed to meet the requirements of the Federal Housing Administration which guaranteed the mortgage loans. Seaside and Seaside No. 2 obtained FHA guaranteed loans and each was responsible for carrying out the project in accordance with the contract with the City of New York. Indeed, at the beginning, Seaside's responsibilities encompassed the entire Seaside Rockaway project, not merely the two buildings which were later deeded to the petitioners. Seaside later sold, for an undisclosed amount, some of the remainder of the land included in the project to a corporation not related in any way to the Zukerman interests. Seaside's contract with the City would preclude it from transferring the properties to the petitioners until it had discharged its responsibility of completing the buildings, and its contracts with the petitioners were in accord therewith in that they provided for the deeding of the properties to petitioners only after completion of the buildings. Each contract provides that "It is understood and agreed that at all times *after the execution of said Deeds* that as between the parties hereto ownership shall be in [the petitioner]." (Emphasis supplied.) It is our conclusion that Seaside and Seaside No. 2 were not mere straw or conduit corporations, but were formed for business purposes and were engaged in carrying on business activity. Accordingly, we think they must be recognized as separate entities, apart from the petitioners.

Nor, in our opinion, can it be considered that Seaside and Seaside No. 2 were agents of the petitioners in holding the land and in having the buildings constructed. As stated in *Moline Properties, Inc.* v. *Commissioner, supra*, this argument is basically the same as the argument with respect to disregarding the separate identity of the corporations. Furthermore, there is no evidence of an actual contract of agency. Nor do we see present the usual incidents of an agency relationship. See

*National Carbide Corp.* v. *Commissioner*, 336 U.S. 422, and *Greer* v. *Commissioner*, (C.A. 5) 334 F. 2d 20. Under the circumstances, we cannot conclude that the purchase and construction of the properties by Seaside and Seaside No. 2 were tantamount to purchase and construction by the petitioners.[10]

The contracts which petitioners entered into with Seaside on March 15, 1961, did not vest in them equitable ownership of the properties. They were not contracts of purchase and sale but were contracts to purchase and sell after completion of the buildings. At that time, of course, the contemplated replacement properties, aside from the land, were not in existence. And it is to be observed that while the petitioners had advanced to Seaside the money withdrawn from the register of the District Court, and possibly other funds in an undisclosed amount, this did not constitute full payment for the properties to be acquired. Under the contracts the purchase price was to be paid by assumption by the petitioners of the mortgages on the properties. This, of course, did not occur prior to the time the deeds were executed in favor of the petitioners. In addition, the contracts between the petitioners and Seaside provided that taxes and other charges were to be apportioned between the parties as of the date of title. Passage of title and the transfer of possession and control was not to occur prior to completion of the buildings. Thus, prior to that time the petitioners had not assumed all the benefits and burdens of ownership of the properties. See *Estate of Herrick L. Johnston*, 51 T.C. 290 (1968).

In view of the foregoing we hold that the respondent did not err in determining that the petitioners did not purchase the claimed replacement properties within the period provided by section 1033 and that they are not entitled to the benefit of the nonrecognition-of-gain provisions thereof.

In their reply brief the petitioners for the first time claim that the respondent should be estopped from contending that they did not purchase the replacement property within the period provided by section 1033(a)(3)(B). Their argument seems to be that since the respondent knew of the March 15, 1961, contracts to purchase the properties in the Seaside Rockaway project, his refusal to extend

---

[10] In passing we think it appropriate to observe that even if we were to attribute to petitioners the purchases of property by Seaside and Seaside No. 2, there would still remain some question as to whether the petitioners, within the statutory period, had purchased replacement properties of a cost equal to the amounts realized upon the condemnation of their Wherry properties. The amount realized included any mortgages on the Wherry properties. *T. J. Foster*, 25 T.C.M. 1390, 1966 P-H. T.C. Memo. par. 66, 273, and *Ramey Investment Corp.*, 26 T.C.M. 17, 1967 P-H. T.C. Memo. par. 67,004. The amounts realized amounted to $4,598,500 in the case of the petitioner Fort Hamilton and $1,587,018 in the case of the petitioner Dayton Development. At Mar. 15, 1961, Seaside had only land which had cost $2,019,962 and this land was to be used for the construction of *six* buildings. Construction of the two buildings in question herein did not commence until April 1962 and they were not completed until Sept. 9 and Oct. 7, 1963, which was after expiration of the permissible replacement periods herein.

the period was arbitrary and unjustified. It appears that the respondent denied the request for an extension only after affording the petitioners proper opportunity to present facts and arguments, and after due consideration thereof. Certainly the statute leaves the matter of an extension to the discretion of the respondent, and we see here no abuse of such discretion.

The petitioners Fort Hamilton and Dayton Development also appear to contend, but without argument on brief, that the gain realized by them during their respective taxable years ended May 31 and November 30, 1961, should be reduced by $205,000 and $170,000, respectively, which they were required to repay to the United States in a subsequent taxable year as a result of the judgment of the District Court. However, since during their taxable years in question they held under claim of right the full amounts which the United States had deposited we think such full amounts were properly included in the computation of gain in such years. See *North American Oil* v. *Burnet*, 286 U.S. 417, wherein the Supreme Court stated in part:

If a taxpayer receives earnings under a claim of right and without restriction as to its disposition, he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent. * * * If in 1922 the Government had prevailed, and the company had been obliged to refund the profits received in 1917, it would have been entitled to a deduction from the profits of 1922, not from those of any earlier year. * * *

See also *United States* v. *Lewis*, 340 U.S. 590; *Conlorez Corp.*, 51 T.C. 467 (1968); and *Harry D. Aldridge*, 51 T.C. 475 (1968). When and to what extent the petitioners may be entitled to a deduction or a recomputation of their tax liability for the year in which they satisfied the judgment are questions which we are not called upon to decide herein. See, however, sec. 1341 of the Code and the regulations thereunder. See also *Arrowsmith* v. *Commissioner*, 344 U.S. 6.

The remaining issue concerns the respondent's disallowance of $16,000 of the $40,000 deduction claimed by the petitioner Fort Hamilton for the taxable year ended May 30, 1961, as compensation paid to its officers, the Zukermans, and his disallowance of $2,000 of the $4,000 deduction claimed by the petitioner Dayton Development for the taxable year ended November 30, 1961, as compensation paid to the Zukermans.[11]

Section 162(a)(1) of the Code provides that there shall be allowed as a deduction a reasonable allowance for salaries or other compensation for personal services actually rendered.

---

[11] Fort Hamilton paid each of the Zukermans $10,000 during the taxable year ended May 31, 1961, and Dayton Development paid each of them $1,000 for the taxable year ended Nov. 30, 1961. On brief the respondent states that his disallowances were made on a prorata basis among the Zukermans.

While the notices of deficiency do not set forth the basis for the respondent's disallowance of a portion of the salaries claimed, counsel for the respondent at the trial, and on brief, conceded that the basis for the disallowance was the determination that no services were performed by the Zukermans for the petitioners after January 31, 1961, since the United States took possession of the Wherry properties on February 1, 1961. The respondent took the position that reasonable annual compensation for the Zukermans as officers of Fort Hamilton during the time that it owned and operated the Wherry property was $36,000 and that since in its taxable year ended May 31, 1961, it owned such property for only 8 months, the allowable salaries should be $24,000. He thus allowed no deduction for compensation for the remaining 4 months in the taxable year. Similarly, in the case of the petitioner Dayton Development respondent determined that reasonable annual compensation for the Zukermans while operating its Wherry property was $12,000, and that since the petitioner owned such property for only 2 months during its fiscal year ended November 30, 1961, only one-sixth of such amount, or $2,000 should be allowed. He thus allowed no deduction for compensation for the remaining 10 months of such taxable year.

Each petitioner did continue in existence throughout its taxable year in question and the evidence establishes that its officers continued to render services, albeit not the same type of services that had theretofore been rendered. It has been shown that the officers concerned themselves throughout the remainder of such taxable years with the litigation arising out of the condemnation, including the issue of just compensation.

While the petitioners have not presented any detailed evidence with respect to the precise activities of each of the Zukermans throughout the taxable years in question, or the amount of time devoted to the petitioners' affairs, we are of the opinion that the respondent was in error in not allowing some deduction for compensation for these officers for the remaining portions of the taxable years ended May 30, 1961, and November 30, 1961, respectively, after the Government took possession of the properties. Under the circumstances, we have exercised our best judgment and have concluded, and found as a fact, that the amount of reasonable compensation for the officers of the petitioner Fort Hamilton for services rendered to it during its taxable year ended May 31, 1961, is $30,000. We have also concluded and have found as a fact that the $4,000 claimed by the petitioner Dayton Development as compensation for its officers for its taxable years ended November 30, 1961, constituted a reasonable allowance.

*Decisions will be entered under Rule 50.*