W. & B. LIQUIDATING CORP., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

W. & B. LIQUIDATING CORP., TRUST, RAYMOND A. HUST AND LEONARD P. MARKERT, TRUSTEES; JEAN W. HOFFMAN; CHARLOTTE C. BUCKLEY; TRUST UNDER THE WILL OF HOWARD C. WILL, DECEASED, CHARLOTTE C. BUCKLEY AND VIRGINIA W. YEAGER, TRUSTEES; ESTATE OF THEODORE C. THOMASMEYER, DECEASED, CHRISTINE W. THOMASMEYER, EXECUTRIX; RICHARD L. WILL; LEONARD P. MARKERT; AND TRUST UNDER THE WILL OF LOUIS E. WILL, MARINE MIDLAND BANK-CENTRAL, TRUSTEE, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 10652–75, 10688–75.[1]    Filed January 2, 1979.

---

[1] These cases have been·consolidated for purposes of trial, briefing, and opinion.

*John T. Hunter*, for the petitioners.
*Kenneth Bersani*, for the respondent.

HALL, *Judge:* Respondent determined a $35,563.16 deficiency in petitioner W. & B. Liquidating Corp.'s income tax for its taxable year ended June 30, 1972. Because W. & B. Liquidating Corp. was dissolved in 1973, respondent determined that petitioners in docket No. 10688–75 were liable as transferees for W. & B. Liquidating Corp.'s asserted income tax deficiency. Petitioners in docket No. 10688–75 have conceded that they are transferees of W. & B. Liquidating Corp. The sole issue remaining is whether W. & B. Liquidating Corp. must recognize the income which it realized through the involuntary conversion of its machine shop.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

W. & B. Liquidating Corp. (W. & B.), formerly known as Will & Baumer Candle Co., Inc., was a New York corporation. Until May 31, 1972, W. & B. maintained its principal place of business in Syracuse, N. Y. On April 20, 1973, W. & B. was dissolved pursuant to section 1003 of the Business Corporation Law of the State of New York.[2]

Petitioners in docket No. 10688–75 are transferees, as defined by section 6901(a)(1)(A),[3] of W. & B. They are all residents of the State of New York or have their principal places of business in the State of New York.

---

[2] N.Y. Bus. Corp. Law sec. 1003 (McKinney 1963).

[3] Unless otherwise noted, all statutory references are to the Internal Revenue Code of 1954, as in effect during the taxable year in issue.

W. & B. was engaged in the manufacture and marketing of candles. From a small beginning in 1855, W. & B. grew to be the largest candle manufacturer in the United States. W. & B. employed the accrual method of accounting and used a fiscal year ending June 30.

On March 2, 1972, a machine shop belonging to W. & B. was severely damaged by an explosion and fire. Prior to the fire, the building functioned as a storage area for vehicles and as a service area for machine and carpentry work. Because of its location, the shop also served as the main artery through which the plant's steam and electrical systems ran from its steam plant and electrical lines to its manufacturing facilities. The explosion and ensuing fire blew out the walls, scorched the inside of the building, destroyed the windows and exits, and caused structural damage. The building was insured against loss by fire under a policy which allowed the owner to reconstruct. The adjusted cost basis of the shop was $480.96.

Two days after the fire, W. & B.'s president, Leonard P. Markert (Markert), met with representatives and adjusters of its insurance company and with Frank Conlon, a general contractor and loss estimator. At that meeting, Conlon was authorized, as W. & B.'s contractor, to proceed to do all that was necessary first to shore up the walls and roof and cover windows and doors of what remained of the machine shop and then restore it to its original condition. Conlon was also instructed to make an estimate of the cost of repair and restoration.

On March 29, 1972, Conlon sent W. & B. a $153,773 estimate for restoration of the shop. Subsequently, W. & B. submitted a proof of claim to its insurance company for $157,461.81. On May 9, 1972, the insurance company notified W. & B. that the claim would be paid in full. Meanwhile, on March 3, 1972, Conlon began shoring up and restoring the machine shop. An agreement on the exact scope of the work to be performed was reduced to writing by Conlon on June 1, 1972, and signed by Markert on June 8, 1972. W. & B. paid Conlon $43,007.36 for work completed as of May 31, 1972. All other restoration work was completed by Conlon on or about October 25, 1972.

Prior to the explosion in the machine shop, Markert, as president of W. & B., had been negotiating with Syracuse China Corp. (Syracuse) for the sale of substantially all of W. & B.'s assets. Syracuse offered to purchase W. & B.'s assets for $60 per

share of W. & B.'s outstanding stock. This offered price remained unchanged even after Syracuse was notified of the damage to the machine shop and plans for its repair.

On April 18, 1972, a resolution was adopted by W. & B.'s board of directors authorizing Markert to enter into a contract with Syracuse for the sale, pursuant to section 337, of W. & B.'s business, including substantially all of its assets. The parties reached an agreement on April 24, 1972. On May 9, 1972, the shareholders of W. & B. met and adopted a plan of complete liquidation pursuant to section 337 and approved the sale of substantially all of W. & B.'s assets to Syracuse for a net cash consideration of $5,831,280, with the assumption by Syracuse of certain liabilities existing on the date of closing. At this meeting, the shareholders also authorized and approved the liquidation of W. & B.

On May 31, 1972, W. & B. and Syracuse closed the sale pursuant to their April 24 agreement.[4] As of that date, W. & B. turned over legal title and control of its assets and operations to Syracuse. The assets purchased by Syracuse included the assignment by W. & B. of the right to the full $157,462 face value of the insurance proceeds due W. & B. as a result of the fire loss. Syracuse allocated $157,462 of the total purchase price of $5,831,280 to an "account receivable—insurance company." On its 1972 income tax return, W. & B. treated the assignment of its right to the insurance proceeds as the sale for $157,462 of an account receivable with a basis of $157,462.

Concurrent with the receipt of W. & B.'s assets, Syracuse assumed substantially all of W. & B.'s obligations. However, W. & B. remained primarily liable on the contract between W. & B. and Conlon to restore the machine shop.

Syracuse collected the following proceeds of insurance on the dates indicated, payable as a result of the fire loss to the machine shop:

---

[4]Prior to closing of the sale, Syracuse formed a subsidiary, W & B C Co., to receive the assets of W. & B. Liquidating Corp. and to perform the duties and obligations of Syracuse under its agreement with W. & B. For ease of discussion, Syracuse and its subsidiary corporation will be referred to as Syracuse.

| Date | Amount |
|---|---|
| June 2, 1972 ............................ | $99,809.18 |
| Dec. 11, 1972 ........................... | 47,817.03 |
| May 1, 1973 ............................. | 9,835.60 |
| | 157,461.81 |

On October 25, 1972, when Conlon completed reconstruction of the fire-damaged building, Syracuse paid him the balance due of approximately $113,973. As noted above, W. & B. had previously paid Conlon $43,007.36 for work completed prior to May 31, 1972.

On or before March 15, 1973, W. & B. distributed all of its assets, consisting solely of cash, to its shareholders in complete liquidation and redemption of all the corporation's outstanding shares of capital stock.

W. & B. elected not to recognize any of its $156,980.85 gain[5] on the involuntary conversion of its machine shop by failing, in accordance with section 1.1033(a)–2(c)(2), Income Tax Regs., to include the gain in its gross income for the taxable year ending June 30, 1972. In his statutory notice, respondent included $113,973 of this gain ($156,980.85 less $43,007.36 reinvested by W. & B. for work completed by Conlon prior to May 31, 1972) in W. & B.'s gross income for the taxable year ending June 30, 1972. Respondent determined that W. & B. was not entitled to nonrecognition under section 1033 with regard to this portion of the gain.

OPINION

Section 1033(a) provides generally that if property is involuntarily converted into money, the gain on the conversion, if any, shall be recognized. However, if the taxpayer during the period specified in section 1033(a)(3)(B) purchases other property similar or related in use to the converted property, section 1033(a)(3)(A)[6] provides that, upon election by the taxpayer, the gain shall be recognized only to the extent that the amount realized upon conversion exceeds the cost of the replacement property.

---

[5]This amount is the net of $157,461.81 received from Syracuse upon W. & B.'s assignment to Syracuse at face value of W. & B.'s right to insurance proceeds, less W. & B.'s adjusted cost basis in the machine shop of $480.96.

[6]Effective Dec. 31, 1976, secs. 1033(a)(3)(A) and 1033(a)(3)(B) were redesignated and amended as secs. 1033(a)(2)(A) and 1033(a)(2)(B), respectively. Secs. 1901(a)(128)(A) and 1901(a)(128)(B) of Pub. L. 94–455, 90 Stat. 1785.

The issue in this case is whether the gain realized by W. & B. Liquidating Corp. (W. & B.) upon the conversion, as a result of fire, of its machine shop is entitled to the benefit of the nonrecognition provisions of section 1033. More specifically, the issue is whether W. & B. "purchased other property" within the specified replacement period.

W. & B. was engaged in the manufacture and marketing of candles. On March 2, 1972, its machine shop was severely damaged by an explosion and fire. While the building was being reconstructed, the shareholders of W. & B. adopted a plan of complete liquidation. On May 31, 1972, W. & B. sold all its assets, including the right to the insurance proceeds for reconstruction of the machine shop, to Syracuse China Corp. (Syracuse). W. & B. paid its contractor, Frank Conlon (Conlon), $43,007.36 for work completed on the machine shop as of May 31, 1972. Reconstruction was completed on October 25, 1972, and Syracuse paid Conlon the $113,973 balance due for his work. On March 15, 1973, W. & B. distributed all of its assets, then consisting of cash, to its shareholders in complete liquidation.

The gain realized by W. & B. as a result of the conversion of its machine shop is not entitled to nonrecognition under section 337(a) since the fire occurred prior to the adoption by W. & B. of a plan of liquidation. *Central Tablet Manufacturing Co. v. United States*, 417 U.S. 673 (1974).[7] However, respondent applies the nonrecognition provisions of section 1033(a)(3)(A) where a corporation elects to replace the property involuntarily converted and subsequently adopts a plan of liquidation under sections 331(a)(1) and 337(a) before the property is replaced *if* the replacement is completed (1) within the replacement period and (2) prior to completion of the corporate liquidation. Rev. Rul. 55–517, 1955–2 C.B. 297.

Petitioners contend that the requirements of Rev. Rul. 55–517, *supra*, were met in that W. & B. completed restoration of the machine shop on or about October 25, 1972, prior to the expiration of the period for replacement and prior to the completion of the liquidation of W. & B. Respondent, on the other hand, contends that W. & B. did not "purchase" the portion of the property that was reconstructed after May 31,

---

[7]But see sec. 4, Pub. L. 95–628, 92 Stat. 3628, effective for taxable years ending after Nov. 10, 1978, which would allow corporations 60 days after a casualty to adopt a sec. 337 plan.

1972, the date W. & B. sold its entire business to Syracuse; Syracuse completed restoration of the machine shop. Therefore, respondent contends that W. & B. must recognize gain with respect to the amount realized on conversion less the amount W. & B. paid Conlon prior to May 31, 1972. See sec. 1033(a)(3)(A). We agree with respondent.

It is well settled that for purposes of section 1033(a)(3)(A) a purchase occurs "when ownership of the property is acquired, and that acquisition of ownership takes place upon the passage of the benefits and burdens of ownership of the property." *Dettmers v. Commissioner*, 430 F.2d 1019, 1021–1022 (6th Cir. 1970), affg. *Estate of Johnston v. Commissioner*, 51 T.C. 290 (1968). Factors indicating that the benefits and burdens of ownership have shifted include the passage of title, payment of taxes and insurance, and possession and control of the premises. *Dettmers v. Commissioner, supra; Fort Hamilton Manor, Inc. v. Commissioner*, 51 T.C. 707, 720 (1969), affd. 445 F.2d 879 (2d Cir. 1971).

In this case, W. & B. held the benefits and burdens of the partially reconstructed machine shop only during the time it remained owner and operator of the candle manufacturing business. Until the business was sold to Syracuse, W. & B. held legal title to, paid insurance and taxes on, and possessed and controlled the machine shop as partially reconstructed. W. & B. paid Conlon $43,007.36 for work completed as of May 31, 1972. Syracuse acquired ownership of the machine shop as of May 31, 1972. After that date, Syracuse held legal title and possession and control of the machine shop as it was gradually being rebuilt.

Petitioners contend, however, that the contract between W. & B. and Conlon is evidence that W. & B. purchased the rebuilt machine shop. They note that the contract remained in effect even after the sale of assets to Syracuse and W. & B. remained primarily liable on the contract. However, Syracuse assumed this liability at the time it purchased W. & B.'s assets and if it had not paid for reconstruction of the machine shop and Conlon had looked to W. & B. for payment, W. & B. would have had a right to reimbursement from Syracuse. Therefore we agree with respondent[8] that W. & B. did not "purchase" replacement

---

[8]Respondent appears to base his conclusion in part on the fact that Syracuse, not W. & B., paid Conlon the balance due of $113,973.49. Because we hold that W. & B. did not "purchase other

property as required by section 1033(a)(3)(A). To hold otherwise would undermine the holding of *Central Tablet Manufacturing Co. v. United States, supra.* Here, W. & B. has sold all its property to Syracuse, has assigned Syracuse the insurance proceeds, and Syracuse had assumed W. & B.'s obligations under the contract with Conlon to rebuild.

In the alternative, petitioners contend that Syracuse acted as W. & B.'s agent in completing its replacement of the machine shop. Petitioners rely on *Estate of Goodman v. United States,* 199 F.2d 895 (3d Cir. 1952), and *Estate of Morris v. Commissioner,* 454 F.2d 208 (4th Cir. 1972), which held that purchases existed for purposes of section 1033(a)(3)(A) where fiduciaries acted on behalf of the decedent taxpayers and where those actions were under court supervision to carry out the decedent's intent. Here we have no evidence of any agency or fiduciary relationship between W. & B. and Syracuse, court-supervised or otherwise. See *Fort Hamilton Manor, Inc.,* 51 T.C at 719–720. Petitioners did not present any evidence showing that Syracuse was under an obligation to W. & B. to complete reconstruction of the machine shop. The relationship between W. & B. and Syracuse was that of purchaser and seller. Syracuse invested the assigned insurance proceeds in its own interest as owner of the machine shop.

Accordingly, we conclude that petitioners must recognize gain on that portion of the insurance recovery related to the work completed after May 31, 1972, since W. & B. did not purchase, within the meaning of section 1033(a)(3)(A), any replacement property after that date.

*Decision will be entered for the respondent.*

---

property" as required by sec. 1033 in that it did not possess the benefits and the burdens of the machine shop after May 31, 1972, we need not address respondent's argument. We note in passing, however, that the predecessor to sec. 1033(a)(3), sec. 112(f), I.R.C. 1939, required that the proceeds from the property involuntarily converted be directly traceable to the replacement property. This requirement was eliminated as of Dec. 31, 1950, and in its place, Congress substituted the present language requiring a purchase of other property similar or related in use. Sec. 1(a), Pub. L. 251, 65 Stat. 746.